## THE STATE v. WOODWARD, Appellant.

### Division Two, June 14, 1904.

1. **ATTEMPT TO BRIBE: Meaning of Statute.** It is as much a felony under the statute to attempt to corrupt a juror by offering to give him a bribe, as it is to actually tender him a bribe which he accepts.

2. ———**: Offering to Give: Tender: Acceptance.** By "offering to give," as used in the statute concerning attempted bribery of a juror (sec. 2043, R. S. 1899), is not meant an actual tender of money or other gratuity. By those words is meant a corrupt proposal or declaration of a willingness to give a bribe with intent to bias the juror's verdict. The statute includes the corrupt attempt, and it is wholly immaterial whether the offer is accepted or not, or whether the juror is corrupted or not, or whether the would-be corruptor gains his point or not.

State v. Woodward.

3. **CONSTRUING CRIMINAL STATUTES: Province of Courts.** Criminal statutes are to be strictly construed in favor of the defendant. But courts are not authorized to so interpret them as to defeat the obvious purpose of the Legislature. Words are not to be so narrowed as to exclude cases which those words in their ordinary acceptation would include.

4. **ATTEMPT TO BRIBE: Sufficient Evidence.** The evidence showed that the defendant proposed to a fellow juror to give him ten dollars if he decided a damage suit against a street railway in favor of the company, and tried to arrange a meeting at a saloon for that night between him and the company's claim agent, who would there give him the money with which to pay the amount; that he renewed the offer the next morning as the two were entering the courthouse, and that after the jury had retired he urged the juror to act accordingly; that he had on the same day made like offers to another juror and tried to arrange for a meeting with him at the saloon also. *Held,* that this evidence was sufficient to convict the defendant under our statute concerning an attempt to bribe.

5. ———: **Statement Before Trial Judge: Admissibility.** The foreman of the trial jury had reported to the judge that two of the jurors had been approached. The judge took down their names, and after the jury was discharged, the judge requested the foreman and these two jurors, and the defendant, also a juror, and the attorneys for each litigant to meet him in his chambers, and there he announced what the foreman had said to him, and asked him to make a statement. Then he asked the defendant if he wished to say anything, then the other two jurors, then the defendant again, and all of them made statements. The defendant denied that he had offered the other two jurors $10 each to decide the case for a street railway defendant, but admitted stating to them that $1.50 was very small pay for a juror, and to asking them to meet him in the evening at a saloon. No inducement or threat was made to defendant or the other jurors by anyone, none of them were sworn, but their statements were taken down by the official stenographer of the court there present. *Held,* that these circumstances do not show that the defendant was compelled to testify against himself on that occasion, and that his statements there made must be held to be a voluntary confession.

6. ———: ———: ———: **Self-Invited Error.** The unofficial copy made by the stenographer of the statements made before the trial judge in response to an inquiry by him of the defendant and his accusers if they wished to say anything, is inadmissible, as hearsay. But if it is offered by the State in response to an insistence by defendant's counsel that it is better evidence than

State v. Woodward.

the oral testimony of the others present as to what occurred at the time, the error is self-invited and harmless.

7. **CONTINUANCE: Essentials of Application.** Application for a continuance must be, first, formally sufficient; second, it must show that reasonable diligence has been made to secure the attendance of the witness or to obtain his deposition; third, it must appear therefrom, and from the counter-affidavit and the circumstances, that it is probable that his evidence could be timely secured if the continuance were granted; fourth, the evidence which it sets forth as the things which the witnesses would testify to if present, must not impress the reasonable mind as being incredible. Even if all these necessary essentials are present, it is still not error to deny the continuance if the evidence which it sets forth as that the witnesses would testify to if present, relates to no issue in the case, and is meant to contradict some apprehended statements of the State's witnesses which they do not make when called to testify.

Appeal from Johnson Circuit Court.—*Hon. W. L. Jarrott,* Judge.

AFFIRMED.

*J. W. Suddath* with *J. W. Garner* for appellant.

(1) Criminal and penal statutes are to be strictly construed in all parts which are against defendants, but liberally construed in those which are in their favor. State v. Bryant, 90 Mo. 535; State v. Gritzner, 134 Mo. 512; State v. Howard, 137 Mo. 289; State v. McCance, 110 Mo. 398; State v. McLain, 49 Mo. App. 400. (2) To offer is: "To bring or put forward; to hold out for acceptance; to present for acceptance or rejection; to tender or make tender of; to come into view, or to be at hand." Century Dictionary, vol. 4, p. 4090. "To present as an act of worship; to bring to or before; to hold out to; to present for acceptance or rejection; as, to offer a present or a bribe; to present itself; to be at hand." Webster's International Dictionary. "To tender; to present for acceptance or refusal; To proffer, as, to offer one's hand, to offer a book." American Encyclopaedic Dictionary. "To present; to exhibit for acceptance or rejection; to tender; to be present; to be at

hand.'' Worcester's Dictionary. (3) There is a distinction between offering and promising a bribe or reward. State v. Harker, 4 Harr. (Del.) 559; 17 Am. & Eng. Ency. Law (1 Ed.), 39; Morrison v. Springer, 15 Iowa 327; Chase v. Miller, 41 Pa. St. 419. (4) Defendant can not by any means be compelled to testify against himself. State v. Young, 119 Mo. 495; In matter of Charles Green, 86 Mo. App. 216; State ex rel. v. Simmons Hardware Co., 109 Mo. 118. (5) When an accused is compelled to answer questions touching his supposed connection with the crime then under investigation, without his being informed of his legal rights, and the effect of his replies, these admissions or statements are not admissible against him. Coffee v. State, 23 Am. St. Rep. 525; People v. Mondon, 57 Am. Rep. 709; s. c., 103 N. Y. 211; People v. McMahan, 15 N. Y. 384. (6) Names of witnesses should be endorsed on indictment. R. S. 1899, sec. 2517; State v. Nettles, 153 Mo. 464; State v. Stirfel, 106 Mo. 129; State v. Roy, 83 Mo. 268; State v. Goody, 84 Mo. 220. (7) It is right that when a citizen's liberty or life is endangered he should know the names of the witnesses by whom the charge is to be made good, so he can prepare his defense. State v. Stirfel, 106 Mo. 129; State v. Roy, 83 Mo. 268; State v. Goody, 84 Mo. 220. (8) An application for continuance by defendant in a criminal cause on account of absence of a material witness, which is the first one made and meets the requirements of the statute, should be granted. State v. Bradley, 90 Mo. 160.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, *H. S. Hadley* and *W. H. Wallace* for the State.

(1) The words, ''to give,'' which are found in the indictment in this case, following the word ''offering,'' are omitted from the quotation furnished to the

court by appellant. The omission of these words furnishes the foundation of appellant's principal argument that this conviction should be set aside on the ground that the evidence failed to establish the crime charged. Fortunately, the high character of appellant's counsel relieves them from any suspicion of attempting intentionally to deceive the court and secure the discharge of their client by misrepresentation as to the language of the indictment. The statute makes it a felony "to corrupt or attempt to corrupt one sworn as a juror by giving or offering to give any gift or gratuity whatsoever." The meaning of the expression "offering to give" must be determined by comparison and relation to the expression "by giving," and also by the accepted meaning of the word "offer" when followed by the words "to give." Such a method is the sensible and proper one for determining the intention of the legislators who enacted this statute. The statute does not use the words "promise to give," and sane men, anxious to see our courts kept free from the corrupting influences of the bribe giver, can hardly contend seriously that the legislators intended that only those persons would be guilty under the statute who succeeded in having their bribes accepted, or who made a "legal tender" of their gift or gratuity. Such a construction of the statute would be a ridiculous absurdity, for a "gift or gratuity" might not be the subject of manual delivery or "legal tender." In 21 Am. and Eng. Ency. of Law, 832, the definition of the word "offer" is given as "a proposition to do a thing." "It is sometimes a convertible term with 'attempt.'" And the following well-considered cases are cited in support of these definitions: People v. Ah Fook, 62 Cal. 494; Riggs v. Dennison, 3 Johns. Cas. (N. Y.), 202; Willis v. Standard Oil Co., 50 Minn. 296; Commonwealth v. Harris, 1 Leg. Gaz. (Pa.) 455.

(2) The second contention of the appellant is that what Woodward said in Judge Slover's chambers, and what was said by others to him and in his presence during

the course of conversation touching the charge under investigation in this case, was not admissible. Appellant cites no Missouri cases to sustain this contention. The law as laid down frequently by this court is that admissions or confessions of the defendant are admissible if made voluntarily, there being no threats, promises or inducements used to secure them. State v. Shackleford, 148 Mo. 493; State v. Vaughn, 152 Mo. 73; State v. McKenzie, 144 Mo. 40; State v. Robinson, 160 Mo. 125; State v. Northway, 164 Mo. 513; State v. Armstrong, 157 Mo. 257; State v. Bradford, 156 Mo. 91. (3) No diligence was shown on the part of the defendant to locate and secure the testimony of witness Church, who had been, as was shown by evidence, offered on the part of the State in opposition to the application for a continuance, a fugitive from justice for nearly a year from two indictments pending against him in the criminal court of Jackson county. And then the hope of securing the testimony of this character of witnesses is not sufficiently strong to encourage the courts in granting a continuance for that purpose. In reference to the witnesses Warner and Trattell, it can be said that the application so far as it relates to these two mysterious personages demonstrates the wisdom of the frequent decisions of this court, that the granting or refusing of a continuance is a matter peculiarly within the discretion of the trial court. State v. Webster, 152 Mo. 87; State v. Tettaton, 159 Mo. 354. Furthermore, in view of the length of time this case had been pending, no diligence had been shown to secure the testimony of these witnesses. State v. Kindred, 148 Mo. 270.

GANTT, P. J.—On the third day of May, 1901, the grand jury of Jackson county preferred an indictment against Grant Woodward, the defendant, in which he was charged to have unlawfully, knowingly, willfully, corruptly and feloniously attempted to corrupt one Joseph Gephart who had been duly summoned, im-

paneled and sworn as one of the jurors in a certain civil cause wherein Mary H. Walton was plaintiff and the Metropolitan Street Railway Company was defendant, then pending and on trial in the circuit court of Jackson county, and then and there having jurisdiction of said cause, "by then and there unlawfully, knowingly, willfully, corruptly and feloniously offering to give to the said Joseph Gephart a certain gift, and gratuity, to-wit, ten dollars, with the felonious intent to bias the mind of the said Joseph Gephart and to incline him to be more favorable to the side of the defendant aforesaid than to the side of the plaintiff aforesaid in the trial and decision of the said issue so joined and on trial before said jury as aforesaid."

There was a second count which was dismissed, and hence it is not necessary to notice it on this appeal.

The defendant was duly arraigned and entered his plea of not guilty and the cause was set down for trial June 14, 1901, and reset for June 20, 1901, On the twenty-fifth of June, 1901, the cause was continued to the September term, 1901, for want of time to try the same, and defendant admitted to bail.

At the September term, 1901, the defendant filed a demurrer to the indictment which was heard and overruled, whereupon defendant filed his application for a change of venue, which was granted, and the cause ordered removed to the Johnson county circuit court, and defendant recognized to appear in said court at the February term, 1902.

At the February term, 1902, of the Johnson county circuit court the State announced ready, whereupon the defendant filed his motion and affidavit for a continuance, which was heard and overruled, and a jury was impaneled and the defendant was put on trial, and on the twenty-third day of April the jury returned a verdict of guilty and assessed the punishment of defendant at two years in the penitentiary. A motion for a new trial was filed, heard and overruled, and the de-

fendant sentenced in accordance with the verdict.   The
defendant thereupon filed his application for an appeal
and an appeal was granted to this court.   The time for
filing the bill of exceptions was extended from time to
time until the eighth of June, 1903, when said bill of
exceptions was signed and filed and made part of the
record.

The evidence on the part of the State was, in sub-
stance, the following:

Charles C. Byers, deputy circuit clerk of Jackson
county, testified he was the deputy who served as clerk of
Judge Slover's division of said circuit court, Division
No. 2. He produced the original of the regular panel of
jurors drawn for the April term, 1901, of said circuit
court, certified to said court by James L. Phelps, clerk
of the county court of Jackson county. Among other ju-
rors so drawn and summoned to serve on said regular
panel were Joseph Gephart, Elisha Dancy, Patrick J.
Kelly and Grant Woodward.

The record of the proceedings in the cause of Mary
H. Walton, plaintiff, against the Metropolitan Street
Railway Company, defendant, pending in said Divi-
sion No. 2 of the circuit court of Jackson county at the
April term, 1901, of said court, was offered and read in
evidence, from which it appears that Joseph Gephart,
Grant Woodward, Elisha Dancy and Patrick J. Kelly
were four of the panel of twelve jurors examined, tried
and sworn to try said cause of Mary H. Walton v. Metro-
politan Street Railway Company, a suit for damages for
personal injuries, which trial began April 25, 1901.   It
was disclosed thereby that said cause was heard and
argued by counsel, and was submitted to the jury on the
twenty-sixth day of April, 1901, and that said jury not
being able to agree upon a verdict were by the court
discharged on the twenty-sixth day of April, 1901.
Joseph Gephart testified on behalf of the State that on
the morning of April 25, 1901, he met the defendant,
Grant Woodward, near the courthouse in Kansas City

and Woodward said to him: "There isn't much in this case down here. There is more if you do as I tell you. The Metropolitan has about eight hundred cases, and if we fix this case right, there is ten dollars in it. This is only ten dollars. The large cases are twenty-five dollars. If you will do the right thing you will live on the jury a long time." To this proposition he, Gephart, made no reply. At noon that day, he, Gephart, met Woodward again, and Woodward said to him: "It is all right if you do what I told you; that there is ten dollars in this case if you decide in favor of the Metropolitan and twenty-five in large ones." When the court adjourned that evening, Woodward asked Gephart to meet him that night at a saloon opposite the courthouse saying, "Mr. Church will be up there and give me a check and I will get you the money. I will have to see Mr. Church to get it." The evidence showed that Mr. Church was a claim agent of the Metropolitan Street Railway Company. Gephart did not go to the saloon that night as requested by Woodward, but met Woodward as he (Gephart) was going into the courthouse the next morning. Woodward again approached him and said to him that it would be all right if Gephart did as he told him. Gephart made no reply, but went on into the jury room, the case then having been finally submitted to the jury. In the jury room Woodward sat by Gephart and said to him, "keep still." When the jury was discharged about five o'clock that evening, Gephart reported the matter to Judge Slover. After the court adjourned, Judge Slover requested Gephart, Dancy and the defendant Woodward to remain after the adjournment of the court, and they did, and at his request went into Judge Slover's chambers in the courthouse. The attorneys on both sides of the Walton case were also there, and the judge and his stenographer, Mr. Jones.

On cross-examination Gephart stated this was the first case he sat in as juror at that term. Had no previous

acquaintance with defendant.   That at neither of these conversations did defendant exhibit to Gephart any money.   He testified that defendant said he would go with Gephart to Church and get the money.   That he, said Church, was claim agent of the Metropolitan.   Witness never went to Mr. Church and didn't know him until defendant pointed him out of his own motion.   Gephart told Woodward he couldn't meet him at Hannan & Dixon's saloon.   Then defendant said, "Meeet me over at Keenan's saloon at ten o'clock."   Keenan's was opposite the courthouse.   Gephart did not go, but saw defendant as he went into the courthouse next morning.

Elisha Dancy, another of the jurors, testified he was a member of the jury in the Walton case, and while the jury were being impaneled Woodward spoke to him and asked him what he was doing there, was he there for his health? and he replied he was there to discharge his duty as a juror.   The next day (Thursday), when the jury were discharged for lunch, as they went out of the courthouse, defendant came up to him and inquired where he was going to dinner, and he told him Eighth and Walnut.   Defendant said, "I will walk with you," and as they walked along defendant said, "They haven't got any case at all have they?"   Why I says, "I don't know. I haven't heard the testimony yet."   He, defendant, said, "They have no case and they have got no money on that side.   The Metropolitan has got plenty of money.   You might as well have a little piece of it as anybody else."   They walked along and defendant took out a piece of paper with the names of jurors on it and said, "I have got enough already fixed to help through the case, but I want to know whether I can depend on you or not."   He asked my name and when they reached Walnut and Eighth defendant asked Dancy to meet him at Hannan & Dixon's saloon opposite the New York Life Building.   That afternoon when court adjourned they walked up the street together and some

lawyers were in front of them and Dancy pointing to a man asked defendant who he was. Defendant said, "That is Mr. Church, the Metropolitan claim agent. He will meet you at Keenan's saloon and fix it up with you, but you must not let him know you know him." He requested Dancy to meet him at Keenan's at nine o'clock and Dancy told him he had to help his boy do the work. He would see about it. He didn't go to Hannan & Dixon's or Keenan's. Next morning (Friday) as he went into the courthouse on his way to the jury room, he encountered defendant in the corridor, and defendant says, "You didn't come over?" and Dancy said, "No, he couldn't," whereupon defendant said, "I will get you ten dollars if you will do the right thing in this case." Dancy told him he couldn't do it. When the jury were discharged that evening he went with defendant to Judge Slover's chambers. On cross-examination, says Woodward, the defendant, did not exhibit the ten dollars, but said he had it. The reason he inquired about Church was he saw him talking with the lawyers for the defense and just wanted to know who he was.

Patrick Kelly deposed to practically the same offer from defendant to him to help the Metropolitan in the case, saying there was $25 in it, and Kelly told him he couldn't bring in a verdict for the company. Friday morning Kelly told the defendant he was caught at it and he had best come to terms or he would be arrested. Defendant said nobody could arrest him.

F. C. Farr, Esq., attorney for Mary H. Walton in said case, testified that on Friday evening Judge Slover sent for him. The jury were discharged. Judge Slover called the foreman, Andrew Miller, to his desk and took some names and then discharged the jury and requested those whose names he had taken to remain after he discharged the jury. He then adjourned court and requested the four jurors and Mr. Crane, attorney for the Metropolitan, and witness to go to his chambers.

Preliminary to this witness stating what occurred in Judge Slover's rooms, the witness was asked if it was not taken by the stenographer, and he said the substance of it was but not all, he thought. Nobody was sworn. Miller, the foreman, was asked what the trouble was, and he proceeded to tell what Dancy and Gephart had charged against defendant. Judge Slover then asked defendant if he desired to make any statement in regard to the matter, and defendant made a statement in which he said what these gentlemen have reported was not true. It amounted to a denial of what Miller had said they said. The judge then asked Dancy for his statement to the effect that defendant had offered him money. The witness then repeated what Dancy said which was in effect the same as his evidence above recited. Gephart then made his statement also in substance as he testified in this case. Judge Slover then asked defendant, after hearing Dancy and Gephart's statements, if he desired to make any further statement. Defendant was greatly excited. He said, "I don't know as I offered anybody any money. He didn't have any money." Mr. Farr asked him why he wanted to make those appointments with Dancy and Gephart, and at first he denied doing so. Then he explained that he wanted them to know Mr. Church when they saw him. He asked them to go to Hannan & Dixon's because it was a good place to get something to eat. At this point counsel for defendant insisted the stenographer's notes were the best evidence, and if this evidence was admissible at all that it was the best evidence, and he would take no exception on the ground that the notes were not official. On cross-examination Mr. Farr stated that Judge Slover stated "the jury is discharged and those of you whose names I will call will please remain." Then he called the names of Miller, Dancy, Gephart and Woodward. He had already requested Mr. Crane and myself to remain and then he left the bench. He didn't remember whether Judge Slover made a formal an-

nouncement of the adjournment of the court, but when he left the bench everybody left and the judge did not return to the bench that evening.

The transcript of the evidence taken in Judge Slover's room was then offered and read. In it the following appears in answer to Judge Slover's inquiries: "Now what do you say, Mr. Woodward?" "Well, he seemed to take one side of the case and me the other. I don't know as I offered anybody any money. I haven't any. I have not been approached, except somebody spoke to me on the street as I came down this morning, and he said, 'If you vote against the Metropolitan there is some money in it for you.' I thought it was a juror at first, but I didn't know him. I didn't know any of the jury until I came to the courthouse. He says, 'If you vote against the Metropolitan there is some money in it.' I says to myself—I thought he was on the jury—I says, 'I don't see much in the case. It didn't look like much of a case to me,' and he went away from me. Well he said, 'you vote against the Metropolitan and I will see you after the verdict.' I don't know who it was. I didn't even know his name and he went on and left me there. It seemed then to come up in the jury room and we were six and six." By Mr. Miller: "That was one time?" By Mr. Woodward: "Well seven to five or six. And it got down until afterward it stood seven to five, and I thought we might agree on a compromise verdict and I voted that way, to give this woman $200." By Mr. Miller: "$150?" By Mr. Woodward: "You heard what I said, $200. I thought that would pay the expense she had been to." "Describe the man who spoke to you on the street, his age and appearance." "Well, he was a little heavier than I am, about my height, with a sandy mustache." "What kind of clothes did he have on?" "He had a kind of a dark suit; I didn't pay much attention to him. I thought he was joking with me at first. He probably knew me, but I didn't know him."

"Do you want to say anything Mr. Woodward?" Mr. Woodward: "I deny both allegations. I offered them no money. I had no money to offer them. Nobody said anything to me about giving them any money. I don't work for that Metropolitan and never did. I only know Mr. Church by sight. I am not acquainted with him personally. I have no money in the case. Nobody has told me anything about that there was money."

To its introduction counsel for defendant objected so far as the evidence of Dancy and Gephart was concerned, because hearsay, and as to defendant's statement, because he had contradicted all their statements at the time and he had no control over them.

The further objection was made that defendant's statement was taken in a judicial proceeding and he was required to testify, and that being true, to testify against himself. These objections were overruled and defendant excepted.

Judge J. H. Slover testified that he was one of the judges of the circuit court of Jackson county. The Walton case was tried in his division. After the case had been submitted to the jury the foreman reported to him at the noon recess there was trouble in the jury. When he sent for the jury about four o'clock in the afternoon they all said they couldn't agree and the foreman said there was trouble in the jury. Two of the jurors claimed they had been approached. He gave me the names of Gephart and Dancy. I discharged the jury and requested Woodward, Dancy, Gephart and the foreman Miller to remain. I then adjourned court and requested the attorneys in the case and these four jurors to accompany me to my chambers. I had my stenographer take down all that passed and I have read the transcript and it is full and correct. None of the jurors were sworn. I simply asked each one to make his statement, that is all, and directed the stenographer to take it down, everything that was said.

For the defendant, M. E. Jones, the stenographer,

was called and testified that he took down everything that transpired that evening in Judge Slover's room. The defendant also offered Robert J. Holmes, Wm. Bean, B. L. Good and C. J. White who testified his reputation as an honest, law-abiding citizen was good. He also offered the evidence of Mr. Satterlee, the superintendent, that his name was not on the pay-roll of the Metropolitan Street Railway Company.

I. In the order of the argument the first proposition for our consideration is that the evidence failed to make a case to be submitted to the jury under section 2043, Revised Statutes 1899, which makes it a felony for any person to corrupt or attempt to corrupt any juror "by giving or offering to give any gift or gratuity with the intent to bias the mind of such juror or incline him to be more favorable to one side than to the other in relation to any cause, matter or proceeding which may be pending in the court to which said juror shall have been summoned." Learned counsel for defendant, both in oral argument and brief, have by inadvertence, doubtless, omitted the words "to give" after the words "by feloniously offering," whereby the indictment is made to read "by feloniously *offering* to said Joseph Gephart a certain gift," etc., instead of "by feloniously *offering to give* to said Joseph Gephart," etc. The omission of these words "to give" is made the basis of an argument as to the meaning of the word "*offering,*" which counsel insist means "to tender" or to actually exhibit the gratuity or bribe so that the juror could at once accept or reject the same, and inasmuch as Gephart testified the defendant at neither of the alleged interviews displayed or exhibited any money, the proof fell short.

We think counsel have misconstrued the statute on which the indictment is bottomed. It is as much a felony by this statute to *attempt to corrupt* a juror by offering to give him a bribe as to actually tender him a bribe

which he accepts.   The charge in the indictment is in
the language of the statute and conforms to the indict-
ment in State v. Williams, 136 Mo. 293, which met our
approval and is sufficient.   The charge here, just as in
the Williams case, is attempted bribery.   The meaning
of the words "offering to give" must be determined
largely by the context in which it is found, and by its
relation to the expression "by giving" just preceding it.
By "offerng to give" does not mean, as here used, an
actual tender of money or other gratuity.   In the Wil-
liams case, 136 Mo. 293, Williams said to Dickenson, the
juror, "that if he would keep quiet, and was retained on
the jury panel of twelve, and would hang the jury or
bring in a verdict of not guilty, he would see him well
paid; that he could afford to leave the farm and sit upon
that jury and hang it."   Not only was there no actual
tender, but the amount which he was to receive was not
even specified, and yet we all agreed that such offer
brought the defendant in that case clearly within the
words and spirit of the statute.   Judge SHERWOOD,
speaking for the court, said:   "The crime of which the
defendant was convicted was known at common law,
and is an ancient offense.   It was entitled 'embracery.'
It consists in all such practices as tend corruptly to in-
fluence a juror.   The crime is made up of the *attempt*
thus to influence a juror.  Upon such attempt being made,
whether successful or not, the crime is consummate.
The *corpus delicti*, the body, essence and substance of
the offense, being the corrupt attempt, it is wholly im-
material whether the would-be corruptor gains his point
or not, or whether the juror thus approached gives any
verdict or not, or whether the verdict be true or false."
[2 Bish. New Crim. Law, secs. 384 and 344, et seq.; 2
Archbold's Crim. Prac., 906.] The statute, then, can not
be interpreted correctly by segregating the word "offer-
ing" from its context and construing it to mean that only
those persons can be guilty of its violation who make a
legal tender of their bribes, but must be read as it is

written, "by giving or *offering to give* any gift, gratuity," etc., and when so read the plain, natural and ordinary signification of these words is not that there shall be a legal tender, an open exhibition of the bribe so that it can be accepted or rejected, but it clearly means a corrupt proposal or declaration of a willingness to give such bribe with the intent to bias the juror's verdict. In 2 Bouvier's Law Dictionary 327, the definition of "offer" is "a proposal to do a thing," and such was the definition practically given to it in the Williams case, supra.

Suppose the offer should be a piece of land or regular employment at good wages, in neither of which cases it would be possible to make the actual legal tender for which defendant contends, and yet such an *offer to give* would prove equally as effective and seductive as an actual tender of money and as clearly violative of the statute. The statute is a salutary and wise one and the practices it aims to prevent, strike at the very foundations of justice and tend to destroy confidence and respect for the administration of justice by our courts.

The statute wisely includes the attempt, and is not confined to cases wherein the corrupt offer is accepted, and the juror corrupted, and it is not to be restricted to those attempts only in which a legal tender of the bribe is made. If so construed, in the future the actual exhibition of the bribe will never be made until the victim has been seduced from the path of his sworn duty and has signified his willingness to be corrupted. While criminal statutes are to be strictly construed in favor of the defendant, the courts are not authorized to so interpret them as to defeat the obvious purpose of the Legislature or to so narrow the words of the statute as to exclude cases which those words in their ordinary acceptation would include. [U. S. v. Wiltberger, 5 Wheat. 76; U. S. v. Hartwell, 6 Wall. 385; Sutherland on Stat. Const., sec. 349, and cases cited.]

In People v. Ah Fook, 62 Cal. 493, the statute under review was section 67 of the criminal code of Cali-

fornia, which provided that "every person who gives or *offers* any bribe," etc. The information charged that the defendant on a certain day to one Mead, an executive officer, a bribe, to-wit, two hundred dollars, willfully, and feloniously did offer, with intent to corruptly influence said officer in his action to discharge Me Youk, a Chinese woman, in his charge by virtue of a warrant of arrest. The evidence was that the defendant said to the officer, "You catch him Chinawoman for me; get him out where I can get him in a buggy; I give you two hundred dollars." *No money was tendered and none exhibited,* and the contention was that the proof failed.

MORRISON, C. J., said, "Was the crime complete without the tender or production of the money?" and it was held that it was. [Citing U. S. v. Worrall, 2 Dall. 384; State v. Ellis, 33 N. J. L. 102; Walsh v. People, 65 Ill. 60; Bouvier's Law Dictionary, "Offer."] The court quoted with approval these words: "The reason for the law is plain. The *offer* is a sore temptation to the weak or depraved. It tends to corrupt, and as the law abhors the least tendency to corruption, it punishes the act which is calculated to debase and which may affect prejudicially the morals of the community." As to the meaning of offer see, also, Willis v. Standard Oil Co., 50 Minn. l. c. 296.

In 21 Am. and Eng. Ency. of Law (2 Ed.), 832, the definition of the word "offer" is given as, "a proposition to do a thing. It is sometimes a convertible term with 'attempt.'"

The Delaware, Iowa and Pennsylvania cases cited by counsel for defendant all relate to the construction of particular statutes in relation to the violation of election laws in which it is held that in order to constitute an unlawful offer to vote, the offer must consist of acts so unequivocal as to leave no doubt of the intention of the offender. These cases must be understood with reference to the particular statutes under view by the courts,

but they do not militate against the views we have expressed of the statute before us in this case.

Accordingly we hold there was ample evidence, if believed by the jury, to convict the defendant of offering to give the juror Gephart a bribe to bias and incline his mind for the defendant in the Walton case and that there was no failure of proof under the statute.

II. But it is further insisted that error was committed in the admission of the statements made by defendant to Judge Slover in his chambers after the jury had been discharged and the court adjourned. The ground of this objection is that the defendant was compelled to testify against himself on that occasion; that his confessions were not voluntary.

The circumstances must be kept in view. Charges of tampering with the jury had been made to the foreman and by him conveyed to the court. Judge Slover, in the most commendable spirit of fairness, requested the counsel for the two litigants and the three jurors involved, together with the foreman, to accompany him to his chambers. When they were all there together he stated that the foreman had reported to him there was trouble in the jury that had resulted in the mistrial. The foreman then stated that Dancy and Gephart had charged defendant with trying to bribe them. The judge then said to defendant, " 'Now what have you to say Mr. Woodward?' The defendant was not sworn and no threat or coercion resorted to to obtain his statement. He was not under arrest. The whole proceeding was entirely informal. Without the slightest objection the defendant made his statement. Denied he had tried to bribe the juror. And said the only offer to bribe that he knew of came to himself as he went or returned from lunch when some one he did not know spoke to him and said, 'If you vote against the Metropolitan there is some money in it.' I says to myself, 'I don't see much in the case. It didn't look like much of a case

to me,' and then this man went away from me. He said, 'You vote against the Metropolitan, and I will see you after the verdict.' I don't know who it was. I didn't know his name. I don't know as I offered anybody any money. I haven't any.''

Then the court requested Dancy and Gephart to make their statements and they testified to the defendant's different conversations with them and his offer to get them $10 each if they would vote for the company. When they were through, the judge again said to defendant, ''Do you want to say anything, Mr. Woodward?'' Whereupon the defendant said, ''I deny both allegations. I offered them no money. I had no money to offer them. I don't work for the Metropolitan and never did. I only know Mr. Church by sight. I am not acquainted with him personally. I have had no money in the case and nobody told me anything about any money, there being any money.''

The judge then asked the lawyers if they wanted to ask any questions. Mr. Farr asked him why he invited the jurors to go to Hannon & Dixon's saloon, and he said he did because they kept a good lunch there. He admitted that he said to Dancy there was no money in sitting on a jury at $1.50 a day. In answer to Mr. Crane he exonerated Mr. Church from any effort to corrupt him or approach him; had never met Mr. Crane or anybody connected with the Metropolitan. Didn't know Mr. Haines, the claim agent of the company. Now, it is obvious he was not under arrest and was not sworn. He was given the privilege of making his own statement in his own way, which he did, and he emphatically denied the charges of Dancy and Gephart as to the bribe and explained his invitation to them to go to lunch at the saloon. There is a total absence of any inducement held out to him to get him to make a confession.

In State v. Patterson, 73 Mo. 705, Judge SHERWOOD made an exhaustive review of the doctrine of the

admissibility of confessions and admissions. Quoting from Greenleaf on Evidence that, "Before any confession can be received in evidence in a criminal case, it must be shown that it was voluntary" (1 Greenleaf, Ev., sec. 219), he said, "This assertion in all its broadness is not supported by authorities. Wharton lays down the rule quite differently: 'In order to exclude evidence of a prisoner's confession, it must appear affirmatively that some inducement was held out to him, by or in the presence of some one having authority.' [1 Amer. Crim. Law, sec. 698.] Roscoe is thought to state the rule more accurately. He says: 'For the purpose of introducing a confession, it is unnecessary, in general, to negative any promise or inducement, unless there is good reason to suspect that something of the kind has taken place.' [Roscoe, Crim. Ev., 54 and 40; Regina v. Williams, 3 Russ. on Crimes 432.] In the case last cited TAUNTON, J., said: 'A confession is presumed to be voluntary unless the contrary is shown, and as no threat or promise is proved to have been made by the constables, it is not to be presumed.' "

Without reproducing the whole of the very able discussion in that case it is sufficient to state the tests which the court announced: "Does the evidence, then, touching the confession and the surrounding circumstances bear about them indications of such influences that the law will not sanction? In short, is there ground for belief that the prisoner has falsely accused himself as guilty of a capital crime? If these questions be answered in the negative, the confession was receivable."

Accordingly it was ruled in that case that a confession made by the prisoner when under arrest on his way from Sedalia to Henry county and while he was tied to his horse so that he could not escape was receivable against him in the absence of any proof that he was induced by any threat or hope of leniency. That case has been cited with approval and reaffirmed on many occasions by this court and its statement of the

law never questioned. In that case the defendant was under arrest and knew he was charged with murder. In this case, he was not under arrest and there is not a semblance that any inducement was held out to him to obtain a confession of guilt, and nothing in the shape of a threat was made. He was not commanded by Judge Slover to make any statement, but was simply given the privilege of clearing himself of the charge made against him by the other two jurors.

We are cited to our opinion in State v. Young, 119 Mo. 495, but the facts of that case are radically different from those in this case. There a young man was summoned before the coroner's jury and sworn and required to testify against himself without being informed he was charged or suspected of his father's murder, and in obvious violation of his constitutional right not to be compelled to testify against himself, and we held that his statement was not voluntary. His statement offered in evidence against him consisted entirely of answers to questions propounded to him. In that case the opinion in People v. McMahon, 15 N. Y. 384, was quoted with approval. Judge SELDEN says: ''The first distinction which it'' (the common law) ''makes is between a declaration or statement made before, and one made after, the accused was conscious of being charged or suspected of crime. If before, it is admissible in all cases, whether under oath or without oath, upon a judicial proceeding or otherwise; but if made afterwards, the law becomes at once cautious and hesitating; the inquiry then is was it voluntary? For unless entirely voluntary, it is held not to be admissible.''

Another distinction made by the common law courts and followed by the courts of this country is that a statement made under oath will not be rejected on account of its having been made under oath unless that oath was administered in the courts of some judicial inquiry in regard to the crime itself for which the person is on tral. In State v. Mullins, 101 Mo. 514, the defendant

voluntarily gave himself up to the nearest justice and voluntarily attended the inquest and gave his own evidence that he acted in self-defense. This court treated the coroner's inquest as if it had been a preliminary examination of the defendant for the offense, and said: ''Treating the defendant then as one occupying the position of a defendant at the preliminary examination, the evidence was competent, provided he testified of his own *volition* and not by compulsion.'' And it was held admissible. In State v. Shackelford, 148 Mo. 499, the defendant after his arrest made a statement to a captain of the police force. It was shown that no threats were employed to extort it and no promises held out by the officer and it was held admissible. To the same effect are State v. Vaughan, 152 Mo. 75; State v. McKenzie, 144 Mo. 48; State v. Hopkirk, 84 Mo. l. c. 284; State v. Bradford, 156 Mo. 91.

The fact that the defendant was not sworn and the very form of the question put by Judge Slover, ''Do you want to say anything, Mr. Woodward?'' on its face precludes all idea of compulsion. The judge, out of a spirit of fairness, simply afforded him an opportunity of denying the charge made against him by Gephart and he denied making the improper offers. Tested by all the rules laid down in the decisions of this court, we are bound to hold that the statements made by defendant were voluntary and were not induced by any threat or promise of immunity and hence no error was committed in admitting them.

Now, as to the fact that the transcript was offered as the best evidence of what he actually said on that occasion. The witnesses Gephart and Dancy had already testified to the statements made by defendant in Judge Slover's chambers, and Mr. Farr had detailed some of it when one of the counsel for defendant at this point insisted that the stenographer's transcript was the best evidence of what was said by defendant. He

said, "If this evidence is to be admitted at all, the transcript is the best evidence.

"Mr. Hadley for the State: This is the only copy of the stenographer's notes made by Judge Slover's stenographer. I am willing to admit it in evidence.

"Mr. Suddath: We say if the evidence is to be admitted at all, we will not object to it as not being official, but we say it is the best evidence. We will not object to it on that account, but we object to it as not being —

"By the Court: Do you dispute it is a correct statement?

"Mr. Suddath: We maintain that it is a correct statement as to what was said by all parties, Mr. Gephart, Mr. Dancy and Mr. Woodward and the whole transaction that took place and the questions by the lawyers."

It was under these circumstances and upon these admissions the transcript of what defendant said in Judge Slover's chambers was admitted by the circuit court. Obviously if this was error it was self-invited on the part of defendant by his counsel. But it must also be added that this transcript in no manner contradicted what the witnesses Dancy, Gephart and Farr had already orally testified to. Their evidence had gone to the jury in the presence of defendant; they were face to face; the jury had observed their demeanor on the stand; their manner of testifying; they had been cross-examined by the defendant and while the transcript ought not to have been admitted in the ordinary and proper course, it is clear it would never have been in evidence save for the demand of the defendant by his counsel. It is clear that it was harmless because everything material in it had been testified orally before the jury and the defendant and it corresponded with their statements—but for the demand made by defendant for it, it would clearly have been inadmissible, as hearsay.

III.  Again it is assigned as error that on the morning of the day before the trial the counsel for the State notified defendant's attorneys that they would ask leave of the court to indorse the names of eleven witnesses on the indictment.  It appears that on April 21, 1902, the attorneys for the State served the following notice on defendant's attorneys:

"To J. J. Williams and J. W. Garner,

"You are hereby notified that the following witnesses will be used in the case of the State of Missouri v. Grant Woodward.  This list is furnished you in lieu of indorsing the same upon the indictment and leave to do which will be asked to-morrow morning in the circuit court of Johnson county.  [Here followed a list of the additional witnesses.]

"HERBERT HADLEY, Pros. Atty."

As a matter of fact leave was not asked to indorse these names and they were not so indorsed.

Of the fourteen names thus furnished the defendant one only testified for the State, Mr. C. C. Byers, the deputy circuit clerk of Jackson county, and he only to identify certain records of the Jackson circuit court in the case of Mary H. Walton v. the Metropolitan Street Railway Company.

One of the witnesses named was sworn and testified for defendant, Mr. M. E. Jones, the stenographer.  This point is without merit, as no possible harm resulted to the defendant by the action of the prosecuting attorney.

IV.  We are thus brought to the last contention for a reversal, to-wit, the refusal to grant a continuance asked for by defendant.  The application was based on the absence of three witnesses, Charles Church, Charles Warner and Samuel Tratell.  The affidavit stated that "Charles Church was at that time a resident of Mason county, Texas, and that defendant had caused a subpoena for said Church to be issued on the eleventh of April, 1902, and placed in the hands of the marshal

of Jackson county, and that the same had been returned
by the marshal not served, because said Church could
not be found in said county of Jackson; that said witness
formerly resided in Kansas City, and his whereabouts
was unknown to defendant at the time of the issuance of
said subpoena, but he has since learned of his residence
in Texas as above stated.   That he has not taken his
deposition because he did not know of his whereabouts
in time to take his deposition.   That Charles Warner
and Samuel Tratell are material witnesses for defend-
ant; that they are both residents of Jackson county, and
have been for a long time; that without defendant's
knowledge said two witnesses on or about March, 1902,
left Kansas City for a trip to England, expecting to be
gone, as defendant is informed and believes, some three
months; that their absence is only temporary and not
permanent; that on or about the eleventh day of April
he caused subpoenas to be issued for these two wit-
nesses and they were returned not found on April 15,
1902; that defendant is informed and believes that
Elisha Dancy and Joseph Gephart, the jurors alleged to
have been attempted to be bribed, intend to testify on
behalf of the State that the said Woodward said to them
or attempted to make arrangements with them to meet
one Charles Church at Hannan & Dixon's saloon then
and there to receive from the said Church money as a
bribe to them to vote on said jury for a finding in favor
of said street railway company, and that Church was to
furnish the money, and that said Woodward had no
money and that said Church was an employee of said
street railway company, and that said witnesses will
testify that there was an arrangement between said
Woodward and said Church by which money was to be
paid them through Woodward as a bribe as jurors in
said cause.   Defendant says he will be able to prove by
said Church that there was never at any time any ar-
rangement by which said jurors were to meet said
Church in Hannan & Dixon's saloon or any other place;

that no such arrangements existed with said Church; that said Church at no time agreed or promised defendant Woodward to furnish him any money whatever to use in bribing jurors and that there was no connection whatever between said defendant Woodward and Church, and will further show that at the time he had no acquaintance whatever with said Church; and that said Church will further testify that he never agreed to give defendant any money to bribe jurors or for any other purpose whatever. That said witness Charles Warner will testify that on or about April 26, 1902, at the courthouse in Kansas City, Jackson county, Missouri, he had a conversation with Elisha Dancy, Joseph P. Gephart and Samuel Tratell, all four of them being together, in which the said witnesses Elisha Dancy and Joseph P. Gephart each said that defendant Grant Woodward had never given or offered to give them any money or anything at all to bribe or get them as jurors to bring in a verdict in favor of the street railway company or for any other purpose; that in said conversation so held between the parties, the facts were discussed as to what occurred. This becomes material from the fact that to substantiate the charge in said indictment the defendant is informed and believes that said witnesses Dancy and Gephart will testify, in behalf of the State, that said Woodward offered them and each of them money to bring in a verdict in favor of the street railway company in that cause. That said witness, Samuel Tratell, will testify that on or about the twenty-sixth of April, 1902, at the courthouse in Kansas City, Jackson county, Missouri, he had a conversation with Elisha Dancy, Joseph P. Gephart, and Charles Warner, all four of them being together, in which the said witnesses Elisha Dancy and Joseph P. Gephart each said that the defendant, Grant Woodward, had never given or offered to give them any money or anything at all to -bribe or get them, as jurors, to bring in a verdict in

favor of the street railway company, or for any other purpose; that in said conversation so held between the parties the facts were discussed as to what occurred. This becomes material from the fact that to substantiate the charges in said indictment the defendant is informed and believes that said witnesses Dancy and Gephart will testify, in behalf of the State, that said Woodward offered them and each of them money to bring in a verdict in favor of the street railway company, in said cause. And that this affiant believes that the facts that said witnesses will testify to as above stated are true and that he is unable to prove such facts by any other witnesses or witness whose testimony can be as readily procured; and that said witnesses and neither of them above named are not absent by the connivance, procurement or consent of the defendant; and that the defendant has used every effort within his power as above set forth, by issuing subpoenaes and inquiring as to the residence of said witnesses, to procure their testimony, and that this application is not made for vexation or delay merely, but to obtain substantial justice on the trial of this cause. Defendant as a further reason for continuing this cause states that he would be unable to proceed to trial of this cause at this term without doing himself a great injustice for the reason that he has had no opportunity to investigate the standing, character and reputation of the fourteen new witnesses which the State gave notice of yesterday that it would ask this morning to indorse upon the indictment and would use as a witness in this case, this being the first notice that defendant had thereof, as more fully appears by his written protest and affidavit heretofore filed in this cause, a copy of which is hereto attached and made a part hereof.'' Subscribed and sworn to by defendant April 22, 1902.

In opposition to the granting of said continuance the State, by its representatives, filed the counter-affidavit of Herbert S. Hadley, Esq., prosecuting attorney of Jackson county, Missouri, in words as follows:

"In reference to the witness, Charles Church, I wish to make the following statement of facts: that he was indicted by a special grand jury in Jackson county, Missouri, in the month of May, 1901, on the charge of being accessory after the fact on the charge of jury-bribing; that he was arrested on this charge and gave bond for his appearance in the month of June in the criminal court of Jackson county, Missouri, at which time this case was set for trial; that afterwards in the month of June, 1901, he was indicted a second time by a special grand jury in Jackson county, Missouri, on the charge of perjury; that when his case was called for trial in the criminal court he forfeited his bond and has since that time been a fugitive from justice, and has never been arrested on the perjury charge against him." Subscribed and sworn to the twenty-second day of April, 1902, before W. H. Henshaw, clerk of the circuit court.

First. As to the absent witness Church, the testimony which it was alleged he would give if present or his deposition secured would have been immaterial, as neither Dancy nor Gephart testified that Church and Woodward had an arrangement by which money was to be paid through Woodward for the purpose of bribing them. It was immaterial whether such an arrangement existed or not or whether Church and defendant were friends or only known to each other by sight. But outside of what he would testify to no diligence whatever was disclosed to obtain his evidence. It was shown by Mr. Hadley's evidence that Church had been a fugitive from justice since June, 1901. The indictment in this case was returned on the third of May, 1901; the cause was set for trial June 14, 1901, and reset for June 26, 1901, and then a change of venue was granted, and the cause sent to Johnson county, and defendant recognized to appear there at the February term, 1902. It does not appear that any subpoena was issued for Church to appear at either of the special sittings in June, 1901, or for the September term, 1901, of the criminal court,

and it nowhere appears when defendant first learned that Church would testify as alleged. It does appear that defendant was out on bail all the time after his arrest in May, 1901, and that he lived in Kansas City where Church also lived. He does not show any effort to ascertain Church's whereabouts before issuing a subpoena for him on the eleventh day of April, about two weeks before the trial in Johnson county. While he does state that he has learned of his whereabouts since the issuance of the subpoena, there is nothing to show that by the exercise of ordinary diligence he might not easily have ascertained where Church was in time to have taken his deposition. Our statute requires one charged with crime to show that he has used due diligence to obtain his witnesses. If he knew Church was a material witness in June, 1901, and there is nothing to show he did not know it then, ordinary diligence required him to issue a subpoena for him for the terms of court in Jackson county, but at all events when the cause was sent on a change of venue to Johnson in November, 1901, he had from that time to April 23, 1901, to prepare for his trial and get his witnesses. He does not disclose to the court how or from whom he learned Church was residing in Mason county, Texas, nor at what point in said county he was, nor any fact which led him to believe this fugitive witness would be in Mason county, Texas, should he endeavor to take his deposition. In a word he does not state what efforts, if any, he made to find said Church so that the court could determine whether they were reasonable or not. It was evident from the affidavit of Mr. Hadley that Church had not been visible at least to the officers of the law in Kansas City since June, 1901, when he forfeited his recognizance, and if defendant wanted him, he was singularly remiss, living as he did in the same city, in not ascertaining before the eleventh of April when he issued his subpoena for Church, that he had left Kansas City nine months before that date, and in not instituting in-

quiries as to his whereabouts, and if he did, in stating to the court of whom he made such inquiries and from whom and when and how he learned he was then in Mason county, and upon what he based his assertion that he would have him present in court at the next term or his deposition. In view of the prosecuting attorney's affidavit it was not probable that this fugitive witness would voluntarily appear in a Missouri court so near Kansas City, and it is extremely doubtful if he would remain to have his deposition taken knowing that our extradition laws would furnish the means of bringing him to Jackson county to answer to the indictments pending against him, if the prosecuting attorney received the notice to take his deposition.

These considerations must have moved the circuit court to think it was too improbable that the evidence of Church would be obtained to base a continuance on that ground.

Second. As to the two witnesses Charles Warner and Samuel Tratell, the application is equally unsatisfactory. The circuit court was not informed where they had resided in Kansas City during their long residence there; nor what their several occupations were; nor whether they were capitalists who were not required to have any business or occupation; whether they are men with families or single. The circuit court was not informed, nor are we, when defendant learned these two witnesses would swear that Dancy and Gephart on the twenty-sixth day of April, 1901 (making all allowances for the mistake in placing the conversation four days after this trial had taken place), had admitted to them in a conversation at the courthouse in Kansas City that the defendant had never offered to give them or either of them any money or anything at all to bribe them as jurors, to bring in a verdict in favor of the street railway company. We are not advised whether they imparted this information to defendant or to some one else, and if to some one else other than defendant, who that

person was. The court was not informed why they left for a "trip to England," whether on a business venture or on pleasure bent; nor what reason defendant had for thinking they would be gone only "some three months;" certainly it was highly improbable that their depositions could be taken, as we are not informed at what point in England they were, nor how long they proposed to stay at any one place. Being without the jurisdiction of the court, they might have felt under no obligation to give up their business or pleasure and tarry at one place until a commission should issue and due notice be given for the taking of their depositions, or to have shortened their stay for the purpose of returning home to testify for defendant, inasmuch as they left Kansas City without advising him of their intention to go abroad. Surely our courts are not called upon to delay public prosecutions on such uncertainties as are disclosed by defendant as to the return of these two witnesses. [State v. Kindred, 148 Mo. 281.] But outside of these considerations, the evidence which they were expected to give was even more improbable. The whole evidence in this case shows that if defendant committed this offense at all, he did it on April 25 and 26, 1901, while a member of the Walton jury. Up to four o'clock on the afternoon of April 26, 1901, there had been no charge against the defendant. When it was brought to the attention of Judge Slover he dismissed the jury and adjourned his court for the day. Thereupon the defendant, Dancy and Gephart went with the judge to his chambers where he made his investigation of the charges. It is conceded this took until six o'clock. Dancy and Gephart each told the same story to Judge Slover in the presence of defendant and the counsel in the case which they testified to in this case; and yet it is asserted that Warner and Tratell would testify that Dancy and Gephart on that same day had a conversation with them in which they both said defendant had not done the very thing which they told Judge Slover he did as late as six o'clock that evening. If they

did it before they went into the jury room, after lunch, they did it before any charge was made, and that is utterly incredible. If they did it after emerging from Judge Slover's chambers at six o'clock, it is even more incredible, as they had in the presence of the judge just stated the contrary. In State v. Dettmer, 124 Mo. 432, Judge SHERWOOD, speaking for the court, said: "An application for a continuance must not only be *formally sufficient,* but one of its essential elements, its prominent feature, must be an *evident good* faith. It must not be a mere dodge-trial paper. Whether good faith prompts the application, the trial court is obviously better fitted, more accurately, to judge. For this reason it is that it has become the uniform rule of this court to defer to the trial court in such matters, and not reverse its action, unless the party assailing that action makes it plainly appear the judicial discretion in that regard has been unsoundly or oppressvely exercised." [State v. Banks, 118 Mo. 117, and cases cited.]

In view of the extreme improbability of obtaining testimony of the alleged witnesses Warner and Tratell and the still greater improbability of its credibility had it been obtained, we think the trial court committed no error in refusing a continuance on the showing made.

We have patiently examined all the errors assigned and in our opinion they are not tenable and the judgment must be and is affirmed. All concur.