THE STATE v. EMERSON WHITE, Appellant.—51 S. W. (2d) 109.

Division Two, June 10, 1932.

738

*Freeman L. Martin* for appellant.

*Stratton Shartel,* Attorney-General, and *Denton Dunn,* Assistant Attorney-General, for respondent.

FITZSIMMONS, C.—Appellant was charged by indictment in the city of St. Louis with murder in the first degree by killing one Pinckney Hollis by means of blows with a hatchet on the head. Upon trial appellant was found guilty as charged and his punishment was fixed at death. From the sentence and judgment he has appealed.

Pinckney Hollis was about seventy years old, and was a man of color. Appellant, Emerson White, is about twenty-nine years old and also is of color. The killing occurred on January 1, 1930, in a one-room house in the rear of 2641 Pine Street, St. Louis, where Hollis lived alone. Appellant White, formerly lived at 2643 Pine Street, next door to Hollis, but when Hollis was killed, White was a janitor in a west end home in the basement of which he slept. Marshall Gaitor, living next door at 2639 Pine Street, a man of the same age as Hollis, had known Hollis for six years, and the two old men visited each other frequently. Gaitor saw Hollis every day in December, 1929, in the last three weeks of which Hollis was sick and in bed half the time. On January 3, 1930, Gaitor went to Hollis' room and knocked. There was no response. The door was locked and, so, Gaitor called a policeman who picked the lock, and entered the room. Pinckney Hollis lay dead upon the floor. Wounds estimated by the policeman at fifteen or twenty, were upon the head of the dead man. Beside the body lay a bloody hatchet, broken milk bottles, a bent poker and a bank deposit book in the name of Hollis. The pockets of the clothes of the dead man had been turned. The contents of a trunk were scattered about. The hasp of the trunk lid had been torn off and the lid forced open. The drawers of a wash-stand had been pulled out and were empty. The mattress and covers of Hollis' bed had been rolled and pushed aside. A piece of a watch chain hun" from the dead man's suspenders but no watch was found. Clothes were strewn here and there. The place was in complete disorder. The coroner performed an autopsy on the body of Hollis and found on the head twelve wounds from one inch to two inches long. Two of the wounds extended through the skull and into the brain with no radiating fractures, showing, in the opinion of the coroner's surgeon, that the wounds had been made with a sharp instrument. Appellant White, testifying in his own behalf, said that, in self-defense he struck Hollis on the head only twice and with the hammer end of the hatchet. Although the body was not found until about 6:30

P. M., January 3, 1930, the time of the death was fixed at January 1, by a written statement of appellant.

The St. Louis police arrested appellant in the basement of the home where he attended to the furnace late in the night of the discovery of the body of Hollis. Several witnesses, all of appellant's own race, testified that he had been hanging about the Pine Street neighborhood where Hollis lived all winter. Appellant wore ragged overalls that winter, but he was appareled in a brown checked suit and a gabardine coat when he went to a Pine Street wake on January 2, and to the funeral the next day. The brown checked suit and coat were identified by several as having been the property of Pinckney Hollis for five or six years. The suit was a familiar sight in the community and the wearing of it by appellant caused much comment at the funeral. Leon Murphy, who rode in a funeral car with appellant, looked at him dressed up, instead of in ragged overalls and observed: "It looks like I know that suit," and appellant answered: "I bought it off a fellow." On the night of the wake at 2612 Pine Street, appellant sold to John Rodgers for a dollar a certain open-faced watch, which at the trial was identified by several as having belonged to Hollis. Leon Murphy was present at the negotiations between appellant and Rodgers for the sale of the watch. Murphy had seen the watch before, as it had passed from one colored owner to another, then to a pawnshop and finally to Hollis. So, in the conversation preceding the sale of the watch Murphy said to Rodgers and to appellant: "I said it didn't look good to me that watch with the chain broke. It looked like it had been snatched and the defendant said it was his."

The body of Hollis had not been found nor was the fact of his death known when appellant sold the watch to Rodgers and wore the brown suit and the gabardine coat to the funeral. When the death was discovered tongues began to wag. Appellant, when arrested, stated that he knew nothing about the death of Hollis. But two city detectives, colored men like appellant, went into the prison cell with him. One of these detectives had come from the same place in Mississippi as had appellant. He offered to help appellant by writing to the latter's parents. Appellant then began to tell things. He directed the police to the west end basement where appellant had worked. He told them that they would find Pinckney Hollis' brown suit and gabardine in a suit case there. The police found the suit and coat as appellant had said. Next appellant told the police that he had locked the door of Hollis' room on the night of January 1, 1930, and had thrown the key in the yard near by. The police found the key. After the police had made these discoveries, appellant made a written statement which the State offered in evidence. The part of the statement describing the affray in Hollis' room is as follows: "'About 8:30

742

o'clock P. M., on January 1, 1930, I was at McGee Hannah's house at 2607 Pine Street rear, I left there and went to the home of a man known to me as Hollis at 2641 Pine Street to get some whiskey. I went to the rear door and knocked on the door, Hollis let me in. I asked him for a half pint of whiskey which he gave me, I gave him a dollar bill out of which he was to take 25 cents the price of the whiskey, he gave me twenty-five cents in change, saying that he was taking out a half dollar that I owed him. I told him that I did not owe him a half dollar. We started to argue then and he ordered me out of his house, and I refused to go. He grabbed a hatchet which was on a box near the stove and struck at me with it. I picked up a milk bottle which was on the floor near a table, and hit him over the head with the bottle striking him twice. He fell to the floor. I then put my hand in his left vest pocked where he kept his money and took from same a $1.00 and four quarters. I then took a poker which was on the floor near the stove and forced open a trunk which was near the wall in the back of the room. Hollis got up and struck at me with the hatchet and I scuffled with him and took the hatchet from him, and I then struck him on the head with the hatchet and he fell, and he started to bleed. As he was lying on the floor he said to me, "I'll see you." I took a three-piece brown suit out of the truck and a gabardine coat which was on the bed and walked out of the house. I went back to McGee Hannah's house. When I took the money out of Hollis' vest pocket I also took a yellow gold, open-face watch.' "

Appellant in his statement identified the brown suit, the gabardine coat, the watch, the hatchet, the poker and the door key in connection with the parts which these articles played in his narrative of the tragedy. Appellant, in his written statement, also said: "At the time I was arrested I was wearing a pair of blue serge trousers, which had blood stains near the bottom on the right leg, and these were the trousers which I wore when I struck Hollis with the hatchet and the blood on the trousers was gotten on there during the struggle with Hollis." The blue trousers were put in evidence. The statement confirmed the testimony of other witnesses about appellant's actions after the killing to the time of his arrest, including his attendance at the wake and the funeral wearing Hollis' brown suit, and the sale of Hollis' watch for a dollar.

Appellant testifying in his own defense, said that the written statement was coerced by blows given him by the two colored detective while they were in the cell with him. The detectives denied this and gave testimony tending to prove that the statement was wholly voluntary, and was given without the aid of threats or promises. Appellant also testified that Hollis gave him bloody wounds about the head, face and mouth with the poker, and, at his trial.

held two months and a half after the affray in Hollis' room, appellant exhibited scars in proof of his statement. A city hospital physician testified that he made a physical examination of appellant. on January 4, 1930, a few hours after appellant made the written statement to the police, and three days after appellant's fight with Hollis. The doctor did not find any laceration on the head of appellant, nor swelling of his jaw or lip or face nor soreness of the neck, of all of which appellant in his testimony at the trial complained as having been caused by the blows of Hollis and the punches of the police. Nude photographs of appellant taken immediately after he made the statement, were offered in evidence, by the State to negative testimony of abuse by officers and wounds by Hollis.

Appellant on cross-examination read his written statement, sentence by sentence, and admitted that he had made to the police substantially the whole statement. He denied that he had said he had used the poker to pry open the trunk. He also denied that he said he took two dollars from Hollis. He said that he took only the change of the original dollar which he gave to Hollis. Appellant, in his direct examination, testified that a few years before the death of Hollis, and while appellant lived next door to Hollis, some of appellant's wearing apparel and his wife's bedding disappeared from a clothes line. On the night of the affair with Hollis appellant accused Hollis of taking these things and appellant offered to give up his claim for this property if Hollis would give him the change of the dollar passed for the whiskey. Appellant in his testimony explained the taking of the clothes and watch of Hollis as compensation for the property which appellant charged Hollis with having stolen a few years before. The court instructed the jury on murder in the first degree, murder in the second degree, manslaughter, self-defense, also circumstantial evidence, presumption of innocence, reasonable doubt, and the law governing the written statement of appellant.

I. Among the instructions given by the court was No. 8, which is as follows: "The court instructs the jury that under the laws of this State every homocide which shall be committed in the perpetration of an attempt to perpetrate a robbery, is deemed Murder in the First Degree. And in this case, if the jury find and believe from the evidence beyond a reasonable doubt, that a homocide occurred while the defendant was robbing or attempting to rob the deceased Pinkney Hollis, then such perpetration or attempt to perpetrate such a robbery stands in lieu of deliberation and premeditation as hereinbefore defined, and the jury will be warranted in finding the defendant guilty of Murder in the First Degree and should so say in their verdict."

Appellant, in his motion for a new trial, complains that this instruction is misleading, confusing and prejudicial. But his specific objection seems to be that the indictment charging murder in the first

degree is in the usual form; that it does not charge that the murder of Hollis was a homicide committed in the perpetration of an attempt to perpetrate a robbery, and therefore that Instruction 8, predicated on that theory, should not have been given. This assignment of error is without merit. This court has ruled in several recent cases that proof that a homicide was committed in the perpetration or attempt to perpetrate a robbery may be made under an indictment or information charging murder in the first degree. [State v. Peak, 292 Mo. 249, 237 S. W. 466; State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132; State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750; State v. Hershon, 329 Mo. 469, 45 S. W. (2d) 60.] The one statute (3982, R. S. 1929) defines murder in the first degree, however the crime may be committed, in the following terms: ''Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.'' An indictment in the usual form being sufficient to support proof that a murder was committed in the perpetration of a robbery, it follows as of course that an instruction like to the one to which appellant makes objection not only properly might have been given in this case but should have been given. An instruction of this nature was part of the statutory duty of the trial court to instruct the jury fully and correctly upon all questions of law arising in the case which were necessary for their information in giving the verdict. [Sec. 3681, R S. 1929.]

■ II. The indictment not having charged that the murder was committed in the perpetration of a robbery, appellant argues that the admission of testimony of the sale or pledge by appellant of a watch alleged to have been owned by appellant was error. The answer to this assignment may be found in the preceding paragraph of this opinion. The issue of fact in this case was clear. Either appellant killed Hollis in the perpetration of a robbery, which was murder in the first degree, or he killed him as the result of an affray under circumstances amounting to murder in the second degree, manslaughter or excusable homicide. The broken watch chain hanging from the suspenders of the dead body of Hollis and the watch offered for sale with a broken chain attached ''looking like it had been snatched,'' as one witness testified, were gruesome bits of evidence, one supplementing the other in support of the State's theory of a homicide committed in the perpetration of a robbery. Appellant, in his motion for a new trial, complains of the admission of testimony concerning his wearing of the clothes of Hollis after the murder. The same reasoning applies to this assignment as to the testimony about the watch. Both assignments are without merit.

■ III. Appellant assigns as error here the action of the trial court in admitting in evidence the written statement of appellant "when it had not been shown that said statement . . . had not been freely and voluntarily given without threats of punishment or promises of immunity." It is sufficient to say that appellant, in his motion for a new trial, did not set forth the admission of the written statement as ground or cause for a new trial. Therefore this assignment of error, made here for the first time, is not properly before us. But a human life is the forfeit in this case and we choose to examine the merits of the assignment. The issue of fact whether appellant made the written statement of his own free will, without fear of punishment or promise of immunity was fairly presented by evidence to the jury. ■ A statement of an accused person, offered in evidence against him, is presumed to be voluntary until the contrary is shown. [State v. Patterson, 73 Mo. 695; State v. Meyers, 99 Mo. 107, 12 S. W. 516; State v. Jones, 171 Mo. 401, 71 S. W. 680, 94 Am. St. Rep. 786; State v. Woodward, 182 Mo. 391, 81 S. W. 857, 103 Am. St. Rep. 646; State v. Armstrong, 203 Mo. 554, 102 S. W. 503; State v. Meyer, 293 Mo. 108, 238 S. W. 457; State v. Reich, 293 Mo. 415, 239 S. W. 835; State v. Hayes (Mo.), 247 S. W. 165; State v. Hershon, 329 Mo. 469, 45 S. W. (2d) 60.] The trial court, in the instant case, concluded an instruction respecting appellant's statements in the following terms: "The court instructs the jury that the word 'voluntary' as used in the foregoing instructions, means spontaneously, of one's own will, without being moved, influenced, or impelled by others. If, therefore, the jury believe that such statement or statements were not voluntarily made, or at the time said alleged statement or statements were made, if you find they were made, it was made by the defendant on account of threats or fear or in the hope of escaping punishment, then the jury should disregard any statement or statements so made in arriving at their verdict." Even if appellant had preserved in his motion for a new trial his objections to the admission of the statement in evidence, the assignment should be ruled against him.

■ IV. Appellant, in his direct examination, answered questions of his counsel to the effect that he had been imprisoned in Illinois for complicity in the interstate transportation of a stolen automobile. He assigns as error in his motion for a new trial and here the action of the trial court in permitting the assistant circuit attorney, on cross-examination, to question appellant as to the details of this offense, the length of time that he served in jail, the kind of automobile stolen and the names of the persons who were jointly charged with him. The cross-examination was upon a matter referred to in his examination in chief and was expressly permitted by statute. [Sec. 3692, R. S. 1929.] This assignment is without any merit whatever.

■ V. The assistant circuit attorney, in his opening statement to the jury, said: "The State can give a case the charge of murder in the first degree. The State could produce five or six or ten or twelve actual eye witnesses to a deliberate and brutal murder. The defendant could come in and take the stand and have the testimony of eight or ten defendant's witnesses and tell a story of his own, based on the question of self-defense or struggle or what not. And even though it is the most unbelievable story in the world where no twelve men would give it credence of any kind, a court, in a case of that kind, would be required to give instructions based on his testimony." Appellant objected that the assistant circuit attorney was attempting to tell the jury what was the law, whereas the court had given the jury the law in its instructions. The trial court overruled the objection and appellant excepted. We do not find error in the action of the court.

■ VI. The assistant circuit attorney, in his closing address to the jury said: "The old gentleman was in the rear of 2641 Pine Street. He was sixty-five or seventy years of age, up from a sick bed. He was struck on the head eight or ten or a dozen times with a hatchet and knocked prone to the floor, and was there in a dying and helpless condition. And the door is shut and locked behind the defendant, and there the old man died, under the circumstances, like a dog. Now is a person of that type and calibre entitled to any sympathy at all? Is he not only guilty of murder in the first degree, but guilty of absolute brutality?" The objection to these remarks was that they were an expression by the State's attorney of his opinion of the guilt of appellant. The trial court overruled the objection and appellant excepted. No rebuke of the State's attorney was asked and the objection must be ruled upon the merits of the reason given. The statements made cannot be classed as such an expression of personal opinion of guilt as sometimes works a reversal of judgment in a criminal case. The assignment is ruled against appellant.

We do not find in this case any reversible error. Therefore we affirm the judgment of the trial court and direct that the sentence of the punishment of death shall be inflicted upon Emerson White, the appellant herein. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur. Date of execution set for July 15, 1932.