**STATE of Missouri, Respondent,**

**v.**

**Eddie Steve GLENN, Appellant.**

**No. 51873.**

Supreme Court of Missouri,
En Banc.

May 13, 1968.

Rehearing Denied June 10, 1968.

**228**

Norman H. Anderson, Atty. Gen., Jefferson City, F. Daley Abels, Special Asst. Atty. Gen., St. Louis, for respondent.

David M. Grant, Joseph S. McDuffie, St. Louis, for appellant.

HOLMAN, Chief Justice.

The indictment in this case charged defendant with murder in the first degree. It was alleged that he shot and killed Paul McCulloch, a St. Louis police officer, on July 2, 1964. A trial resulted in a verdict of guilty and the death penalty was assessed. See §§ 559.010 and 559.030 (all statutory references are to RSMo 1959, V.A.M.S.). Defendant has appealed.

The evidence on the part of the State will support the following statement of facts. Marilyn Morris was driving a Chevrolet automobile on July 2, and at about 6:20 p. m. on that day was double-parked in front of her father's store on North Leffingwell Street in St. Louis. Defendant opened the door and got in on the passenger side of the car and told her to drive on. He had an open knife in his hand. Defendant took four one-dollar bills and some change from her purse, stating that he needed $16 in order to get a shot of dope. Marilyn then gave him her ring. After they had driven for about an hour her car was stopped on 20th Street by Officer Robert Steele, driving a police cruiser, who had heard a radio description of the car. He approached the car on the driver's side and asked Marilyn her name. As she stated her name she got out of the car and ran from the scene. Steele then drew his Smith & Wesson .38–caliber revolver which was loaded with six shells and ordered defendant out of the car. After defendant got out he grabbed for the gun and Steele fired one shot although unable to aim. Defendant and Steele then engaged in a struggle for the revolver. Defendant obtained the weapon and then as Steele slipped and started to fall, defendant fired two shots at him. Defendant then ran across DeSoto Field towards the Pruitt-Igoe Development Project. Steele had considerable blood on his shirt and thought he had been shot although it later developed that he had not. He immediately radioed for help and within less than a minute Officers Atkins and Pott arrived. Officer Pott immediately started in pursuit of defendant, while Atkins took Officer Steele to the hospital. At the Project area Officer Pott saw defendant unsuccessfully trying to enter a 1959 Buick. Defendant then shot at the officer and the officer returned the shot and, a short time later, fired at defendant again. At about that time a canine police car, driven by Officer McCulloch, arrived at the scene and McCulloch shouted to Officer Pott to take "that areaway [east] and I'll take this areaway [west]." At that time Officer Pott saw no other policeman in the area. Officer Pott then heard a shot from the west areaway and then defendant came around the corner of the building four or five feet from where Officer Pott was standing and they each fired point-blank at the other. Officer Pott was shot in the left arm, the bullet also striking his badge either before or after entering his arm.

Officer Kirner went to the scene as the result of a radio call and saw defendant in the east areaway apparently shortly after he had shot Officer Pott. Kirner "crouched" behind a trash container and fired six shots at the defendant. About that time he saw Project policeman Miller shoot at the defendant and then defendant fell when policeman Mueller fired at him with a riot gun. The shell of the riot gun was loaded with 25 metal balls each about one-quarter inch in diameter. Officer

Mueller obtained the gun defendant had been carrying and noted that all six shells therein had been fired.

Officer McCulloch had been killed and was found lying in the west areaway. No one actually saw defendant point his gun at Officer McCulloch and shoot. However, Project Officer Mueller first saw defendant after Officer McCulloch was lying on the ground, at which time defendant was four feet from McCulloch "acting like he was getting out of a scuffle with someone." Also, Esaline King, who lived in the Project area, was standing near a building when defendant walked within three or four feet of her carrying his gun, and immediately thereafter, Officer McCulloch came from the west side of the building and said "halt!" Mrs. King ran and about that time heard a shot. She then glanced back and saw Officer McCulloch fall.

Defendant was taken to the City Hospital. Michael Emery was one of the officers who took him to the hospital and remained with him until 11:30 p. m. At some time on that occasion he tried to talk with defendant who said he had been involved in some type of fight. Defendant was incoherent at the time. Defendant stated that his stomach was hurting and burning.

Dr. Cooper testified that he operated upon defendant on the night of July 2; that he had multiple gunshot wounds, the most serious of which was in his abdomen. During the operation he found that bullets had punctured defendant's colon in two places and also his bladder; that his condition was critical before the surgery, and serious for two days thereafter. Dr. Cooper stated that defendant also had a portion of a bullet in his left foot and two pellets in one of his fingers, but that he did not remove those for perhaps ten days after the first operation.

Dan Reardon, Circuit Attorney at that time, went to the City Hospital at 9 p. m. He testified that he talked with defendant while he was lying on a hospital cart outside the operating room; that at that time he told him that any statement he might give could be used against him in court; that he could have a lawyer if he wanted one and that defendant stated, "I don't need one, I think I am going to die." Outside the hearing of the jury Mr. Reardon testified to certain admissions that were made at that time but the State did not offer that evidence to the jury.

Lieutenant John Keady stated that he questioned defendant about 10 a. m. on the morning of July 3; that after asking him about six questions defendant's voice became very weak and he lapsed into incoherence so he stopped the questioning. The State did not offer before the jury the admissions made by the defendant at that time. Lieutenant Keady, in a hearing outside the presence of the jury, further testified that on July 5 he interviewed defendant. He stated he made no threats or promises but that he also did not warn defendant concerning his right to remain silent or to have counsel, or tell him that anything he said might be used against him. The court ruled that the statements made by the defendant at that time were admissible and could be heard by the jury, although the court made no specific finding as to the voluntary nature of the confession. In his testimony before the jury Lieutenant Keady related the following confession:

"I then asked him, 'Can you recall just what happened night before last in regard to Marilyn Morris and the shooting of police officers?' And he said 'I remember seeing the white girl parked in the car in the 800 block of North Leffingwell.' He said, 'I got in on the right side and showed her my knife and told her to drive on.' He continued, he said, 'I took four dollars from her purse, a dollar of which we bought gas with and I took—she gave me the ring from her finger.' I said, 'Eddie, do you remember shooting the police officers?' And he said, 'Yes, I remember the first police officer that pulled the car over to the curb, * * * I remember shooting him.' I said, 'Well, you didn't shoot that police officer, you shot at him, * * * you didn't hit

him; that was Robert Steele.' I said 'Do you remember the other two police officers?' He said, 'yes.' I said, 'Do you remember shooting them?' He said 'Yes. * * * I remember shooting the policeman who shot me in the side.' I said, 'That would be Ronald Pott. Do you remember shooting Paul McCulloch, the other police officer?' He said, 'I remember shooting a police officer and seeing him fall to the ground.' I said 'Who did you shoot first, the police officer who shot you, who would be Pott, or McCulloch?' He said, 'I don't remember because I had been drinking a lot of liquor and I had taken those two goofballs.'" Lieutenant Keady stated that at that time he knew defendant was on the critical list.

Defendant did not testify. The evidence he offered related to his "plea of not guilty by reason of mental disease or defect excluding responsibility." He offered the testimony of Dr. H. J. Erwin, a specialist in neurology and psychiatry, who examined defendant on May 31, 1965. Dr. Erwin obtained a history from defendant indicating that he began stealing in his early teens and was twice sent to the State Reformatory at Boonville, and later was sentenced to the penitentiary on at least three occasions. It would appear that defendant obtained most of his livelihood by larceny, operating as a pickpocket, and later robbery, and that much of his life from his early teens has been spent in prison. He was 38 years of age at the time of trial. He told Dr. Erwin that on the afternoon before he entered Marilyn's car he had consumed a large quantity of whiskey and had taken some narcotics and felt "inebriated, intoxicated, and in a trance." On the basis of the examination, history, and certain clinical tests administered to defendant this witness expressed the opinion that on July 2, 1964, defendant "did not have possession of his mental faculties as laid down by the law."

In rebuttal the State offered the testimony of Dr. Alan G. Johnson, a psychiatrist, who examined defendant while he was in Malcolm Bliss Hospital from January 22 to February 24, 1965. Dr. Johnson stated he felt that defendant had a personality disorder but expressed the opinion that he did not have any mental disease or defect which would have made him unable to know or appreciate the nature, quality, or wrongfulness of his acts, or would make him unable to conform his actions to the requirements of law.

■ On the first day of the trial defendant presented a motion for a continuance which was based upon various news articles and editorials appearing in St. Louis newspapers for a period of about two weeks before the trial. The articles did not concern this case but were reports of a number of assaults upon police officers. The editorials advocated respect for law, and one criticized two judges who had granted probation to two "notorious criminals." The motion was overruled and that action is assigned as defendant's first contention of error. We see no merit in that contention. Motions for continuance are ordinarily addressed to the sound discretion of the trial court and we see nothing in this record to indicate an abuse of that discretion. Moreover, on voir dire examination, defendant's counsel questioned all of the prospective jurors concerning those articles and editorials and all of them indicated that such would not affect their decision if chosen as jurors in the case. We rule this contention against defendant. State v. Arrington, Mo.Sup., 375 S.W.2d 186.

■ The next point briefed is that the court erred in failing to sustain defendant's motion for judgment of acquittal filed at the close of all the evidence. This motion is based upon the contentions (1) that there was no evidence that defendant actually shot deceased and (2) that the felony-murder doctrine was not applicable because deceased was not killed at the scene of the robbery.

Defendant concedes that the robbery was proved. We have concluded that there was substantial evidence from which the jury reasonably could have found beyond a rea-

sonable doubt that defendant fired the shot which killed Officer McCulloch. In that connection we will state that there was evidence that a ballistics expert compared test bullets from guns fired at the scene with a fragment of a bullet taken from the brain of deceased, and concluded that the fragment was a part of a bullet that had been fired either from the gun in defendant's possession or from the gun of Officer McCulloch. In answer to that evidence defendant says that there were marks on the buildings which could have been made by bullets and that the fatal bullet may have been fired by deceased and ricocheted in such a manner as to strike him. That would be most improbable if not impossible. For the bullet to have ricocheted in that manner it would have had to strike two different walls or other surfaces and, if that occurred, it is unlikely that enough force would remain for the bullet to pierce deceased's skull. The testimony of Mrs. King is very convincing. She saw defendant with the gun in his hand and with deceased in close pursuit. Deceased called "halt!" and shortly thereafter the witness heard *one* shot and looked back and saw deceased falling. Defendant says that deceased may have been killed by a bullet from the gun of some other officer who may have intended to shoot defendant. However, it is significant that Mrs. King saw no other officer in that immediate area. We should also mention defendant's confession. While it is not as clear as might be desired, it could reasonably be construed as an admission that defendant shot McCulloch.

We have the view that the felony-murder doctrine is applicable under the facts of this case. Section 559.010 reads as follows: "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree."

Here proof of the robbery is conceded. Defendant, however, had not left the scene of the robbery, with the proceeds thereof, at the time the car was stopped by Officer Steele. All of the subsequent events resulted from defendant's efforts to escape arrest. It was all a part of one continuous episode. The facts here are somewhat similar to those shown in the case of State v. Adams, 339 Mo. 926, 98 S.W.2d 632, 108 A.L.R. 838. In that case, in ruling a contention similar to that interposed by instant defendant, we said: "It is held in many jurisdictions, including Missouri, that when the homicide is within the res gestae of the initial crime and is an emanation thereof, it is committed in the perpetration of that crime in the statutory sense. Thus it has been often ruled that the statute applies where the initial crime and the homicide were parts of one continuous transaction, and were closely connected in point of time, place and causal relation, as where the killing was done in flight from the scene of the crime to prevent detection, or promote escape." 98 S.W.2d 1. c. 637. See also State v. Engberg, Mo.Sup., 376 S.W.2d 150.

As indicated by the foregoing, we rule that the State made a submissible case of murder in the first degree and hence the court did not err in overruling defendant's motion for a judgment of acquittal.

■ Defendant has briefed a number of assignments relating to the contention that the court erred in admitting the testimony of Dan Reardon and Detective Keady concerning confessions or admissions made by defendant. We will consider those assignments together. We think it obvious that Reardon's testimony could not be considered prejudicial because he did not testify in the presence of the jury to any admissions made by defendant. His testimony before the jury is shown on one page of the transcript. Mr. Reardon stated that he told defendant that any statement he might make could be used against him and that he was entitled to a lawyer if he wanted one, but that defendant's answer was, "I do not need one; I think I am go-

ing to die." Apparently, that testimony was offered on the theory that those admonitions concerning defendant's rights would have a continuing effect and would have a bearing upon the admissibility of a later confession made to witness Keady.

We do not need to give consideration to the conversation Keady had with defendant on July 3 because no admission made by defendant at that time was related to the jury. Our task, therefore, is to consider whether the court erred in admitting the confession made on July 5. At that time defendant was being guarded by two policemen and therefore would be considered as in the custody of the Police Department. There was no evidence presented which in any manner tended to prove that the confession was not voluntary. Mr. Keady questioned defendant for 15 or 20 minutes in what appears to have been a normal conversation. Actually, there was no specific objection at the trial that the confession was not voluntary. The objection made was that it was inadmissible because defendant was not warned of his right to remain silent and of his right to have counsel. There was also some mention of his physical condition and the restriction on his right to talk with friends and relatives. However, he was given a preliminary hearing outside the presence of the jury, and since the matters mentioned were elements to be considered in determining voluntariness we will assume that the issue of voluntariness was implicit in the objection made and should have been determined by the court. In the motion for new trial and here defendant specifically complains that the confession should have been excluded because not voluntarily given. At this point we should perhaps mention that at the preliminary hearing on admissibility of the confession one of defendant's attorneys testified that for two or three weeks after defendant entered the hospital he was not permitted to have any visitors except his mother who was limited to 15 minutes a day. We do not consider that evidence

significant. Although no specific contention of that kind is made on this appeal, we have decided that because of defendant's physical condition and mental outlook at the time he was questioned by Dan Reardon we will assume, for the purposes of this appeal (but do not decide), that the warnings as to defendant's constitutional rights were not effective and we will therefore disregard his testimony in that respect.

■ Since there was no evidence that the confession was involuntary (in the usual sense of that word) we will consider whether it was inadmissible because of the fact that defendant was still quite ill from the wounds he had received and because he was not warned of his right to remain silent and to counsel. Defendant, in briefing his contention that the confession was inadmissible, relies primarily on Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. This case was tried after Escobedo but before Miranda. Therefore, Escobedo is applicable but Miranda is not. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

■ We do not think defendant's physical condition on July 5, 1964, should have any decisive effect on the admissibility of the confession. There is nothing in the record to indicate that he was suffering severe pain or that he did not fully understand the subject matter of the conversation. In regard to Escobedo, this court has frequently said that it will not expand that ruling beyond the facts of that case. State v. Dixon, Mo.Sup., 411 S.W.2d 185. It is obvious that the facts of the case before us do not call for the application of Escobedo.

■ In the situation before us the proper rule to be applied "is whether the totality of circumstances deprived the defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or

psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed. One datum of importance bearing on the inquiry is the presence or absence of advice concerning the defendant's constitutional rights * * *." State v. Smith, Mo.Sup., 415 S. W.2d 748, 750. However, we do not find that (prior to Miranda) it is essential to admissibility that a defendant be advised of his right to remain silent, or that anything he may say could be used against him. For the general rule, see the annotation in 16 L.Ed.2d 1298, where it is said that "[p]rior to Miranda, the prevailing rule was to the effect that extrajudicial confessions were not rendered inadmissible or involuntary by reason of the failure to caution the accused that he need not talk and that, if he did, what he said would be used against him. While under this view failure to inform a defendant of his rights was, of itself, not sufficient to render a confession involuntary, such failure was held a factor, among others, to be taken into consideration, in determining the voluntariness of a confession." And such has long been the pre-Miranda rule in Missouri, and is the rule applicable to a determination of the issue in this case. See State v. Gower, Mo.Sup., 418 S.W.2d 10 [5], State v. Dixon, supra, State v. McCulley, Mo.Sup., 327 S.W.2d 127 [1], and cases cited therein.

We accordingly rule that the confession of defendant was not involuntary or inadmissible as a matter of law and, with the reservation hereinafter discussed, that the trial court ruled properly in admitting same for jury consideration.

In connection with the foregoing, defendant complains of the error of the court in sustaining an objection to his question to Officer Keady as to who exercised control over defendant while he was in the hospital, as shown by the following: "Q. Was this prisoner at that time under the control and direction of the homicide squad? A. No, sir. Q. Whose direction and control was he under? Mr. Fredericks: Objection, calling for a conclusion. Mr.

Grant: As a police officer he should know. The Court: The objection is sustained. Police officers don't know everything. He couldn't give anything but a conclusion or opinion as to whether the hospital authorities were in control or who." We rule that no prejudicial error occurred in that regard. The facts were fully developed in the evidence, i. e., that two policemen guarded defendant 24 hours a day while he was in the hospital. Moreover, we note that defendant made no offer of proof as to what the answer of the witness would have been.

Defendant also asserts that the trial court erred in sustaining an objection to his examination of Officer Keady concerning whether he knew at the time of the confession that only the defendant's mother was permitted to see him. There is no merit in that contention. Defendant was permitted to examine the officer as to that matter, without objection, as shown by the following: "Q. Did you know that there was a detail, around-the-clock detail of, I believe, two or three police officers at that time? A. There were two, yes, sir, I know that. Q. Did you know that there were instructions from your very squad that only his mother was to be permitted to see him, and not longer than 15 minutes a day? A. No, sir, not his mother; his immediate members of his family. Q. His mother only? A. No, sir."

We next consider the points concerning the rulings of the court on voir dire examination in regard to murder in the second degree and manslaughter, and the failure of the court to instruct on second degree murder. When defendant's counsel on voir dire sought to examine the prospective jurors as to whether they would follow instructions on second degree murder and manslaughter the court sustained an objection. After some discussion out of the hearing of the jury the court propounded a question to the veniremen covering that subject. Defendant here contends that the court's ruling was error. We are convinced that no prejudicial error occurred in that regard. In the first place we think

the question of the court sufficiently covered the subject, and furthermore we cannot see how defendant could have been prejudiced by the ruling when second degree murder and manslaughter were not subsequently submitted to the jury.

As indicated, defendant contends that the court erred in not submitting murder in the second degree. No such instruction was offered, but we agree with defendant's assertion that if the evidence warranted such an instruction it was the duty of the court to give it whether requested or not. However, we have concluded that under any view of the evidence there was no basis for a submission of second degree murder. Therefore, the jury was properly instructed that it should either find defendant guilty of murder in the first degree or should acquit him.

We have already held that the evidence supported the felony-murder submission. The killing took place while defendant was attempting to avoid arrest. The undisputed evidence indicates that until the shells in his gun had all been fired defendant shot at every officer who came near him. Defendant concedes that this court has uniformly held that under the felony-murder submission there is no requirement that a second degree instruction be given. State v. Bradley, 361 Mo. 267, 234 S.W.2d 556 [21]; State v. King, 342 Mo. 1067, 119 S.W.2d 322 [8]. Defendant seeks to avoid those decisions by referring to our new criminal insanity law and pointing to § 552.030, wherein it is said, in paragraph 3, that "[e]vidence that the defendant did or did not suffer from a mental disease or defect shall be admissible (1) to prove that the defendant did or did not have a state of mind which is an element of the offense * * *." As best we understand this contention it is that the evidence offered on the insanity defense created an issue as to whether defendant was sufficiently sentient to form the felonious intent necessary to constitute the offense of robbery which is relied on as a part of the felony-murder

submission. No case is cited which discusses that question.

Under the facts of this case we are unable to understand how the evidence concerning defendant's mental condition would warrant an instruction on second degree murder. The robbery and the homicide were both a part of one continuous occurrence. There is no evidence of any different mental condition existing at the time of the robbery than existed at the time of the killing. If defendant had sufficient mental capacity to appreciate the wrongfulness of his conduct as it might have related to murder in the second degree the same capacity would apply to robbery or murder in the first degree. In other words, it is our view that under the evidence in this case the mental disease, if found to exist, would warrant an acquittal but would not operate to reduce the offense from first to second degree murder.

In the argument portion of his brief defendant says that if § 559.010 (heretofore set out) is construed as permitting a submission under the felony-murder theory then it is contended that the statute is unconstitutional under the due process clause of the state and federal constitutions because it is so vague and indefinite that it does not give adequate notice. We cannot consider that point because it was not raised in the trial court but appears for the first time in the brief. We have often said that "[f]ailure to raise the constitutional question in the trial court precludes our consideration of it here." State v. Worley, Mo.Sup., 375 S.W.2d 44, 47.

A number of points in defendant's brief are not supported by any citation of authorities and are not developed in the argument. While we have examined those points and have the view that none of them involve any prejudicial error, we will not extend this opinion with a discussion thereof. By failing to cite authorities and develop those points in the argument defendant is deemed to have abandoned them. Cole v. Morris, Mo.Sup., 409 S.W.2d 668 [6].

■ Two of the points in defendant's brief relate to the alleged error of the trial court in interpreting the testimony of Officer Steele and in overruling defendant's motion to discharge the jury by reason thereof. The matter relates to the testimony of Steele as to whether he fainted after he struggled with defendant and thought he had been shot. He had testified on direct examination as follows: "Q. After you made that request, what did you do? A. I laid down in the street, thinking that I was shot; I had the blood on my shirt, and I was more or less dizzy, and it seemed like all the strength was gone. I laid down in the street so the circulation of the blood would slow down, and so I laid down in the street right beside the cruiser. Q. Did you remain conscious? A. Yes, sir." On cross-examination the following appears: "Q. Now was there or was there not a time when you did lose consciousness and become dizzy or faint? A. Yes, sir. Dizzy, yes, sir, when I went to the cruiser to make my call for assistance and aid, I was dizzy; I had lost a lot of strength. Q. Did you faint? A. No, sir, I didn't faint."

Thereafter, in an effort to impeach the witness defendant read from his deposition, and further examined him as follows: " 'Q. And what did you do? A. I picked up the radio and called for aid. Q. What did you do after that? A. Well, my head was feeling real dizzy, faint, more or less; I noticed blood on my shirt, I didn't know whether— I didn't feel any definite pain—that I had been shot, but like I said, my head was spinning, I was losing all my strength and I assumed I was shot at that time.' Q. Do you remember being asked those questions and giving those answers? A. Yes, sir, I did, but I didn't tell him that I fainted or lost consciousness. The Court: No need to argue it. This is not a statement by the witness that he fainted; he said he felt dizzy and faint. Mr. Grant: Now, your Honor, I certainly object to your Honor interpreting to the jury and commenting on the thrust of this evidence. I think this is a question of fact for the jury to find. I ask

that the jury be instructed to disregard your comment, that this is what this is or it isn't. The Court: There is only one way to interpret that. Mr. Grant: You are invading the province of the jury, which is to determine the facts. The Court: The jury has no province to interpret words that don't need interpreting. Mr. Grant: I ask for a ruling, if your Honor please, on my objection. The Court: Overruled. Mr. Grant: I ask for discharge of the jury at this time * * * for the prejudice and misconception and the intrusion into the fact. The Court: Overruled."

Defendant has cited the case of State v. Bunton, 312 Mo. 655, 280 S.W. 1040, and we fully agree with the statements therein concerning the conduct of a trial judge. In this instance, however, while we think that it would have been better judicial practice for the court to have refrained from commenting, we do not think any prejudicial error occurred. The statement of the court, "no need to argue it," appears to us to have been directed to the witness and not to defendant's attorney. We also have the view that the court's interpretation of the testimoney was actually correct. Moreover, we think the episode should be viewed in the light of the fact that the testimony in controversy was really immaterial. In that situation, as indicated, we rule that no reversible error occurred.

■ David Grant was appointed as an attorney for defendant on July 16, 1964. He was called as a witness for defendant and offered to testify to certain facts to which objections were made and sustained. Defendant now contends that those rulings constituted prejudicial error. His cocounsel asked Mr. Grant what he learned from defendant and others, after his appointment, concerning the members of his family who were permitted to visit him. An objection on the ground of hearsay was properly sustained to that question. Defendant then offered to prove by Mr. Grant that on August 5, 1964, he filed a motion and obtained an order enlarging visitation rights to include relatives other than defendant's moth-

er. An objection to this proffered testimony on the ground that it was immaterial was sustained. We think the trial court ruled correctly. The order of August 5 regarding visitation could not reasonably have been considered as throwing light on the issue as to the custodial restrictions placed upon defendant on July 2. This point is ruled adversely to defendant.

Defendant's next contention is that the court erred in refusing to give his offered instruction on circumstantial evidence. One reason assigned by the court for its ruling was the confession of defendant. The defendant bases his present contention on the fact that evidence of the confession was improperly admitted. Our ruling that the confession was properly admitted disposes of the instant contention. We have recently said that "[a]dmissions of guilt are direct evidence thereof and make instruction on circumstantial evidence unnecessary." State v. Smith, Mo.Sup., 377 S.W.2d 241, 244. This point is accordingly overruled.

The next point (which is identical with the corresponding assignment in the motion for new trial) reads as follows: "The court erred in overruling defendant's objection to Instruction No. 3 for the reason that it removes the element of deliberation and premeditation in the Court's definition of first degree murder and thereby denies to this defendant due process and equal protection of the law." That instruction reads as follows: "The court instructs the jury that under the law of this state, every homicide which shall be committed in an attempt to perpetrate a robbery is deemed Murder in the First Degree. In this case, if the jury find and believe from the evidence to a moral certainty and beyond a reasonable doubt, that a homicide occurred while the defendant was attempting to complete the perpetration of a robbery of Marilyn Morris in the City of St. Louis, Missouri, then such attempt to perpetrate such a robbery stands in lieu of deliberation and premeditation as *hereinbefore* defined, and the jury will be warranted in finding the defendant guilty

of Murder in the First Degree and should so say in their verdict. The word 'robbery' as used in this instruction means * * *."

We see no merit in the foregoing contention. It has always been a part of our statutory law that proof that the homicide was committed in the perpetration or attempted perpetration of robbery is tantamount to proof of the elements constituting the crime of murder in the first degree. See § 559.010; State v. Meyers, 99 Mo. 107, 12 S.W. 516; State v. Bradley, supra. And, in that situation, the jury, if it finds the elements constituting felony-murder, is not required to specifically find deliberation and premeditation. Since the submission in this case was in accord with the statute we rule that defendant was not denied due process and equal protection of the law. In support of this contention defendant has cited cases stating the rule that criminal statutes are strictly construed in favor of a defendant. Those cases are not helpful here where the construction of the statute has been so firmly established for such a long period of time.

In the argument portion of his brief defendant, for the first time, seeks to enlarge the scope of his complaint concerning this instruction beyond that stated in the motion for new trial and his points relied on. He there says that the instruction gave the jury a roving commission in that it did not require the jury to find that defendant fired the fatal shot but only that the homicide occurred during the attempt to complete the robbery. We point out that since this complaint was not contained in the motion for new trial Rule 27.20, V.A.M.R. was not complied with and the point was not preserved for appellate review. State v. Richardson, Mo.Sup., 321 S.W.2d 423 [11]. However, in view of the penalty imposed in this case we have decided to consider the contention ex gratia.

It is true, as defendant asserts, that the instruction in question does not expressly require a finding that defendant fired the shot that killed deceased. It would have been preferable for the instruction to

have included such a finding. However, it has long been the rule in this state that the instruction in question should not be considered alone but that it supplements the other instructions defining and submitting the offense. In this case Instruction No. 1 defined the various words used in submitting murder. Number 2 was an instruction which submitted murder in the conventional manner and required a finding that defendant deliberately, etc. shot McCulloch. As indicated, almost identical instructions have been approved in a number of cases and have been held not to be erroneous when considered with and as a supplement to the other instructions. See State v. Phillips, Mo.Sup., 299 S.W.2d 431; State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, State v. Schnelt, 341 Mo. 241, 108 S.W.2d 377, and State v. White, 330 Mo. 737, 51 S.W.2d 109. In view of the evidence in this case, the instruction, when considered in connection with the other instructions, should not have been confusing to the jury and we accordingly rule that it was not prejudicially erroneous.

■ It is also charged that the court erred in giving Instruction No. 6. That instruction permitted consideration of any statement made by defendant if same were found to have been voluntary, "and that at the time or times when such statements were made he was not suffering from any mental disease or defect and was capable of understanding what he was saying and doing." The jury was directed to disregard any statement not voluntarily made or which was made while defendant was suffering from mental disease so that he was incapable of knowing what he was saying. Defendant's complaint is that the instruction did not direct the jury to take into consideration defendant's physical condition and his sentience or awareness at the time of making any statement. The matter of awareness was certainly covered by the requirement that the jury find that defendant was mentally capable of understanding what he was saying. And we do not think it was necessary to specifically refer to defendant's

physical condition. That was just one of many elements for the jury to consider in determining whether the statement was voluntary. It is not necessary or desirable that the instruction refer to each element to be considered. We rule this contention against defendant.

■ Defendant contends that the court erred in admitting defendant's confession in evidence without having complied with the requirements of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205, and Sims v. State of Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593. Those cases require that where an issue is presented concerning the voluntariness of a confession the court should hold a hearing outside the presence of the jury and should make a finding that the confession was voluntary before admitting it in evidence before the jury. The trial court here only partially complied with that rule. The preliminary hearing was held, but at the conclusion thereof the court simply overruled the objection and stated that the testimony could be presented before the jury. In Sims it is stated that "[a]lthough the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." 87 S.Ct. 643, 17 L.Ed.2d 598. We do not find from the original transcript in this case that such a finding was made.

■ On December 29, 1967, after the submission of this case, we made the following order:

"It appearing from our consideration of this case that the trial court admitted in evidence the confession of defendant as testified to by Officer Keady; that prior thereto the court held a hearing outside the presence of the jury to determine the competency of the confession; that at the conclusion of that hearing the court ruled that the confession was admissible but the transcript of the record does not show with unmistakable clarity that the trial

judge found the confession to be voluntary. [Citations omitted.]

"It is therefore ordered that the trial court, after giving counsel notice and an opportunity to present arguments in regard thereto, and with defendant present, shall proceed to consider the evidence in the record in this case and make an express finding as to whether said confession was or was not voluntary.

"It is further ordered that the aforesaid finding shall be promptly certified to this court to be considered as a supplement to the transcript so that this court may thereafter proceed to make a determination of all the issues in this case."

On March 25, 1968, we received from the Clerk of the Circuit Court of the City of St. Louis for Criminal Causes, a certified copy of "Memorandum of Court Including Finding of Court and Supplemental Transcript." Therein the trial court recites that the matter referred to in the foregoing order was set for consideration and counsel notified; that the argument of counsel was heard on March 2, 1968, with defendant present; that the court thereafter read the entire transcript (three volumes) of the testimony given at the trial and "now makes the express finding that the statements made by defendant Eddie Steve Glenn to Police Officer John Keady on July 5, 1964, as testified to by said Officer Keady in the trial of this case were voluntary. The Court finds that said statements (referred to in the order of the Supreme Court as a confession) were voluntarily made, and the Court further states that this was the Court's belief and finding at the time of trial."

We rule that the admission in evidence of defendant's confession, without the court at the time having made an express finding on the issue of voluntariness, does not constitute prejudicial error. This for the reason that the court, at the trial, held a hearing on that issue out of the presence of the jury, at which both parties were afforded the opportunity of presenting evidence; that at the conclusion of that hearing the objection

to that evidence was overruled and it was ruled to be admissible; that, as heretofore outlined, it now unmistakably appears from the record that the trial court found from the evidence that the statements in question were voluntarily made. In considering a similar situation the Supreme Court of the United States, in Denno, stated that "the jury in the first trial was permitted to deal with the issue of voluntariness and we do not know whether the conviction rested upon the confession; but if it did, there is no constitutional prejudice to Jackson from the New York procedure if the confession is now properly found to be voluntary and therefore admissible. If the jury relied upon it, it was entitled to do so." 378 U.S. l. c. 394, 84 S.Ct. l. c. 1790. As we have said, the confession in this case has now been found to have been voluntary. Therefore, the fact that it was admitted and considered by the jury, without the record disclosing at that time a finding that it was voluntary, could not have been prejudicial to defendant. Jackson v. Denno, supra, and Sims v. State of Georgia, supra.

After the aforementioned findings and supplemental transcript were filed in this court defendant filed additional suggestions in which he contends that at the hearing held on March 2, 1968, the trial court erred in refusing to permit further testimony relating to his physical and mental condition at the time the statements in question were made. That contention is without merit. It was not necessary in the protection of defendant's constitutional rights to permit him to offer additional evidence at that time and such would not have been in accord with orderly judicial procedure. As we have stated the court, during the trial, held a hearing outside the presence of the jury on the issue of voluntariness before admitting the statements in evidence. Defendant had the opportunity to offer any evidence he desired at that time. We now know that the court actually found the statements to have been voluntarily made at that time, but the record did not disclose that finding. Our order of December 29, 1967, was merely for

the purpose of having the trial court consider the evidence in the record and make a finding of record, in the nature of nunc pro tunc, on the issue in question. Although it was proper for the court to hear the argument of counsel in regard to the evidence in the record, we do not believe there was any occasion for the court to hear additional evidence at that time.

This case is clearly distinguishable from the second Sims case, Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634. In that case the Supreme Court of the United States reversed a finding of voluntariness made on the evidence adduced on a pretrial motion because, in the first Sims case, supra, the court had indicated that said evidence was not sufficient to support a finding of voluntariness. In that situation it is obvious that additional supporting evidence must have been offered by the state before a finding of voluntariness could properly be made.

An examination of the record as required by S.Ct. Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.