STATE of Missouri, Respondent,

v.

Nathaniel FLENOID, Appellant.

No. 63534.

Supreme Court of Missouri,
En Banc.

Dec. 3, 1982.

Rehearing Denied Jan. 11, 1983.

Henry Robertson, Asst. Public Defender, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Jay A. Daugherty, Asst. Atty. Gen., Jefferson City, for respondent.

DONNELLY, Chief Justice.

Appellant Nathaniel Flenoid was convicted of first degree murder of Helen Faibish and sentenced to imprisonment for life. On appeal the judgment was reversed and the cause remanded for further proceedings. *State v. Flenoid*, 617 S.W.2d 75 (Mo. banc 1981).

On September 14, 1981, appellant Nathaniel Flenoid was again convicted of first degree murder of Helen Faibish by a jury in the Circuit Court of the City of St. Louis and was again sentenced to imprisonment for life. This Court has exclusive appellate jurisdiction under Mo. Const. art. V, § 3.

On the evening of March 21, 1979, at about 8:00 p.m., Helen Faibish, an art student at Washington University, was returning to a rented studio after washing her clothes at a nearby laundromat. She had her clothes in a white canvas bag and carried books and personal items in a backpack. Upon attempting to unlock the door to the studio, she had some difficulty with her keys. At this moment, appellant approached her and, flourishing a knife, demanded her purse. She refused to surrender it, grabbed at the knife and a struggle ensued. Appellant stabbed her in the heart and on the hip. She died shortly thereafter due to massive internal bleeding. A boy named Tyler Favell heard Helen's shouts and saw appellant holding her from behind and then saw her fall to the ground. At that point appellant looked up at Tyler and fled down a gangway between the studio building and another building. Once behind the buildings, he ran down an alley to the Hamilton Avenue viaduct under which he hid the murder weapon.

Police received information that appellant was involved in the murder. On March

26, 1979, he was picked up by police and questioned. He initially denied any involvement in the incident, but then confessed that he alone committed the murder. On April 3, 1979, appellant asked to talk with police and altered his statement to implicate Melvin Wicks and Dempster Ferguson, but did not attempt to exculpate himself. At trial, he denied that he committed the murder. His statements and confessions were heard by the jury.

Appellant first asserts that the trial court erred in holding admissible his statements and confessions of March 26–27, 1979, and of April 3, 1979, because they were involuntary due to coercion. His primary argument is that his will was gradually overborne on March 26–27. He also contends that the April 3 tape-recorded confession is tainted because the only reason he implicated himself therein was because he was "acutely aware that he had made admissions against interest which could not be retracted." Thus, there is no contention that the April 3 statement was involuntary.

On November 14, 1980, on his first appeal this Court granted appellant's motion for a hearing on the voluntariness of the statements and confessions. The trial court was directed to make specific findings on the voluntariness of the statements as required by *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). On December 5, 1980, that hearing was held and the trial court made those findings. In reviewing those findings we take into account the record made at the first trial and at the December 5 hearing.

From the record, the facts of appellant's arrest and questioning are as follows. On March 26, 1979, police received information that appellant had committed the murder of Helen Faibish. They proceeded to the residence of appellant's natural mother, Jessie Mae Tammons, and his stepfather, Herbert Tammons. Arriving there at approximately 1:00 p.m., they were allowed to enter and apprehended appellant without any commotion or physical violence. The police gave appellant his *Miranda* rights and transported him to police headquarters where they placed him in an interview room in the Homicide Division. Due to the fact that the interview room could not be locked, the police handcuffed appellant's arm to a chair to prevent him from escaping. Appellant sat in the room from 1:30 p.m. until about 6:00 p.m. before he was asked any questions about the murder. During that time he was asked routine questions about his identity, etc. At about 6:00 p.m., Detective Burgoon warned appellant of *Miranda* rights. Appellant answered that he understood his rights and Detective Burgoon conducted a ten minute interview during which appellant stated that he was with friends at the Silver Dollar Disco from approximately 7:30 p.m. until 12:00 midnight the night of the crime. Burgoon left the interview room at approximately ten after six and attempted to verify appellant's alibi. He returned to the homicide division office at about 7:15 or 7:30 p.m. at which time he interviewed other witnesses for about forty-five minutes. Detective Burgoon recalled talking with appellant again at approximately 8:45 or 9:00 p.m. when Sergeant Riley interviewed appellant. Sergeant Riley remembered the interview as beginning at 10:00 p.m.

Before the 10:00 o'clock interview began, Sergeant Riley read appellant his *Miranda* rights. Riley showed appellant a knife sheath which had been found by a school boy in the vicinity of the murder and asked him if it was possible that his finger prints could be on it. Appellant replied that some two weeks earlier a girl named Carl had shown him a knife and the sheath. Moreover, he indicated that he had touched the sheath at that time. Appellant then offered to find out where the murder weapon was. He made a few phone calls in the presence of the officers and then told them to put on their coats and that he would take them to the knife. They left police headquarters at approximately 11:00 p.m. With appellant's guidance, police found the knife jammed into a crevice under the Hamilton Avenue viaduct. It was then past midnight.

Upon returning to police headquarters, the police gave appellant another *Miranda* warning. He stated that he was present when a person named "C.B." (Sylvester Coleman) stabbed Helen Faibish. When the police told appellant that they did not believe him, appellant admitted to killing Ms. Faibish. He recounted in detail how he saw her approach the studio and fumble with her keys; how he pulled out the knife and demanded her purse; how she grabbed at the knife and fought him; how she fell to the ground after he stabbed her. After this statement, appellant was allowed to call his mother. First, officer Riley told her that appellant had admitted killing Ms. Faibish. Appellant then got on the phone and, after a few moments, shouted: "I killed her. I killed her. And if you don't want to talk with me, I don't care."

The April 3, 1979, statement, which appellant contends is tainted, was brought about by his request to speak with police. He was given a *Miranda* warning and in his statement he implicated Melvin Wicks and Dempster Ferguson. He did not attempt to exculpate himself except that he stated that Wicks actually stabbed the victim. This statement was taped and the tape was played to the jury during the trial.

■ The rule is clear that a confession that is not voluntary is inadmissible in evidence. *State v. Flowers,* 592 S.W.2d 167, 169 (Mo. banc 1979). In determining whether statements are voluntary, a court must consider the totality of the circumstances. *State v. Flowers,* 592 S.W.2d at 168–169. This involves a case by case method of analysis; no single fact is dispositive. *Id.,* at 169. Missouri follows the rule that the voluntariness must be proved by a preponderance of the evidence. *State v. Flowers,* 592 S.W.2d at 168–169; *see also State v. White,* 622 S.W.2d 939 (Mo. banc 1981). Since appellant makes no claim of physical coercion or threats in connection with the statements, the issue narrows to whether some type of impermissible mental coercion was employed, or circumstances combine to make the confession involuntary. In determining whether a confession was obtained by mental coercion, "the age, experience and intelligence of the accused must be considered, along with all other circumstances." *State v. Flowers,* 592 S.W.2d at 169. Other factors include gender, lack of education, infirmity, and unusual susceptibility to coercion. *Id.* Finally, misrepresentation by police of evidence against a defendant can be a factor. *See Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

■ From the record in this case there appears no evidence strong enough to support the proposition that any of the statements were involuntary. Appellant urges that his will was overborne through coercion. He submits that he was unusually susceptible to such coercion because he has a second grade education, a "history of hyperactivity, mental disorder, and seizures which require medication." Although these assertions are made, there was no expert testimony supporting them. *Cf. State v. Flowers,* 592 S.W.2d at 169. Also, appellant had dealt with police on prior convictions. Appellant further urges that there is no evidence that he received food or drink during his interrogation on March 26. Officer Burgoon stated that he gave appellant some coffee. Moreover, appellant never testified that he was denied food; the basis of his complaint is that police could not remember if he was fed during the time in question. This Court will not require the State to negative every possible circumstance which, if developed, could present an issue of fact as to whether a confession is voluntary. *State v. Nolan,* 423 S.W.2d 815, 818 (Mo.1968). Finally, officer Riley's question about whether appellant thought his fingerprints could be on the sheath was not a misrepresentation of evidence. It merely played upon appellant's knowledge that he had handled the sheath. The fact that his fingerprints were not on it does not render the confession involuntary.

The trial court did not abuse its discretion in ruling the confessions voluntary.

Appellant next contends that the trial court erred in holding admissible his incriminating statements to and in the presence of

police because he "was denied his right to counsel before and during interrogation [in that] [t]he arresting police officers heard him ask his mother to call a lawyer but, rather than honor his assertion of right, took him to police headquarters, detained and interrogated him. It was thus made clear to appellant that his right had been denied, rendering ineffectual any subsequent waiver upon which the state may seek to rely." Arresting police, who gave appellant his *Miranda* warning, did not hear appellant ask his mother to obtain counsel. Moreover, appellant indicated he understood his rights but did not tell officers he wanted legal counsel.

█ The factual setting which appellant urges as being supportive of his right to counsel argument appeared neither in the first trial (March 1980) nor in the second trial (September 1981). It appears only in the December 5, 1980, hearing on the voluntariness of the confessions.

In *State v. Glenn*, 429 S.W.2d 225 (Mo. banc 1968), this Court ordered, in identical language to the order in this case, a post-trial hearing on the voluntariness of a confession. In *Glenn*, as here, there was a hearing during trial on the motion to suppress the statements, the issue of voluntariness was presented to the jury during trial, and the court was required to make specific findings to comply with *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The appellant in *Glenn* complained that the trial court erred in refusing to allow further testimony, in the post-trial hearing, as to his physical and mental condition at the time the statements were made. The Court handled this argument as follows:

> [T]he court, during the trial, held a hearing outside the presence of the jury on the issue of voluntariness before admitting the statements in evidence. Defendant had the opportunity to offer any evidence he desired at that time . . . . Our order . . . was merely for the purpose of having the trial court consider the evidence in the record . . . . Although it was proper for the court to hear argu-

ment of counsel in regard to the evidence in the record, we do not believe there was any occasion for the court to hear additional evidence at that time.

*State v. Glenn*, 429 S.W.2d at 238–239.

The purpose and scope of our order in this case is the same as it was in *Glenn*. Therefore, we decline to consider appellant's claim concerning evidence he sought to put in the record for the first time at the December 5, 1980, hearing.

█ Appellant next contends that the trial court erred in denying his motion *in limine* at the December 5, 1980, hearing. He sought to have the court rule that none of his testimony at the hearing could be used against him at any later trial. The court's denial of this motion, he argues, prejudiced him by confronting him with the risk of waiving the right against self-incrimination in order to show that the confessions were involuntary. Appellant did not testify at the December 5 hearing. Nor did appellant testify at the hearing on the motion to suppress the statements at the first trial. He did, however, testify at both the first trial and the second trial.

It must be noted that this point of error was not properly preserved for this Court's review. Unlike the other rulings by the trial court, which were incorporated in the second trial by stipulation of the parties, this particular complaint was not raised in the motion for new trial. Having reviewed the record to determine whether appellant is entitled to "plain error" relief, we find that no manifest injustice or miscarriage of justice has resulted. Consequently, this assertion of error is denied.

Appellant finally asserts that the trial court erred in allowing the State to use the deposition of Melvin Wicks as substantive evidence in that appellant was denied his right to confront and cross-examine the witness. At trial, appellant called Melvin Wicks to the stand. Refusing to testify, he claimed his Fifth Amendment right against self-incrimination. The prosecutor cross-examined Wicks with a deposition taken of Wicks by appellant's attorney on September

19, 1979 (prior to the first trial). Appellant now contends that the prosecutor's having read Wicks' statements from the deposition constituted reading them into the record as substantive evidence.

The essence of the deposition testimony with which the prosecutor impeached Wicks was that appellant came to Wicks' apartment immediately after he committed the offense in question; that he had blood on his sweater; that he told Wicks and others present that he tried to rob a woman and had to stab her; that appellant was then wearing a blue and white sweater, blue slacks, and a long gray leather coat; that Wicks later heard on the news that a woman was killed and asked appellant if she was "the one" and appellant replied that she was; and that Wicks went to police two days after hearing this news.

The general rule is that evidence of extrajudicial statements made by a witness who is not a party and whose declarations are not binding as admissions is admissible only to impeach or discredit the witness, and is not competent as substantive evidence of the facts to which such statements relate. *State v. Granberry*, 491 S.W.2d 528, 530 (Mo. banc 1973). However, there is reason to hold that the deposition was not used as substantive evidence in this case. The prosecutor went through an impeachment procedure but never read the deposition into the record. The incriminating contents of the deposition were not argued by the prosecutor in closing argument, nor did they provide an evidentiary *sine qua non* for the State's case. *Cf. State v. Granberry, supra.* Under the circumstances and facts in this record, no manifest injustice or miscarriage of justice has occurred.

The judgment is affirmed.

RENDLEN, SEILER, WELLIVER, HIGGINS and GUNN, JJ., and HENLEY, Senior Judge, concur.

BILLINGS, J., not participating because not a member of the Court when cause was submitted.